```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :      12 Civ. 3109 (DLC)
EASTMAN KODAK COMPANY,                  :
                          Plaintiff,    :      OPINION AND ORDER
                                       :
              -v-                       :
                                       :
RICOH COMPANY, LTD.,                    :
                                       :
                          Defendant.    :
                                       :
                                       :
-------------------------------------- X
```

For the Plaintiff:
Robert J. Gunther
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Michael J. Summersgill
Jordan L. Hirsch
Wilmer Cutler Pickering Hale & Dorr LLP
60 State Street
Boston, MA 02109

For the Defendant:
David Eiseman
Philip C. Sternhell
Quinn Emanuel Urquhart & Sullivan LLP
1299 Washington Ave. NW, Suite 825
Washington, DC 20004

Ryan S. Goldstein
Quinn Emanuel Urquhart & Sullivan LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017

Melissa J. Bailey
Quinn Emanuel Urquhart & Sullivan LLP
50 California Street, 22nd Floor
San Francisco, CA 94111

DENISE COTE, District Judge:

In this action, plaintiff Eastman Kodak Company ("Kodak") seeks to recover royalty payments allegedly owed by defendant Ricoh Company, Ltd. ("Ricoh") under an after-acquired business clause of the parties' Patent License Agreement ("PLA"). Kodak has filed a motion for partial summary judgment with respect to whether Ricoh breached the PLA. For the following reasons, Kodak's motion is granted in part.

BACKGROUND

The following facts are undisputed or taken in the light most favorable to Ricoh, unless otherwise noted. Kodak is a picture and printing company with a patent portfolio encompassing over one thousand digital camera patents. Ricoh is a Japan-based imaging and electronics company. Kodak and Ricoh entered into the PLA on May 1, 2002. Pentax Corporation was a company selling digital cameras that was acquired by Ricoh in July of 2011. Although Kodak is suing Ricoh in this action for a breach of the PLA's royalty provision, the heart of the parties' dispute requires a description of Kodak's business relationship with Pentax from roughly 2002 through 2011.

2002-2011: Kodak and Pentax's Business Relationship

Around 2002, Kodak and Pentax began to explore the

possibility of developing a business relationship.  On several occasions in 2002, Pentax's President Fumio Urano ("Urano") met with Kodak executives and exchanged ideas regarding a business alliance.  On these occasions, patent licensing was never discussed.

In March of 2003, executives of Kodak and Pentax met at a conference of the Photo Marketing Association in Las Vegas, Nevada.  Kodak's Chief Executive Officer Dan Carp, President Willy Shih, and Vice President of Digital Imaging Business Gregory Westbrook were in attendance, as were Pentax's President Urano, General Manager of the Imaging Systems Business Division Masataka Tsuruta ("Tsuruta"), and General Manager Haraguchi Nakano.  Through their discussions at this event, the proposed business alliance began to take shape.  In particular, the executives discussed three ideas: (1) Pentax would act as an agent or dealer for Kodak's digital cameras in Japan, and Kodak would, in return, sell Pentax's digital cameras in the United States; (2) Pentax would purchase printers that connect to digital cameras from Kodak and sell them as Pentax-branded printers; and (3) Pentax would purchase charge-coupled device ("CCD") sensors from Kodak for incorporation into Pentax's digital cameras.  At the conclusion of the meeting, the top executives agreed to pursue a "comprehensive" business alliance.

Once again, however, there was no discussion about patents. Nevertheless, Urano believed that there was a tacit agreement that the right to use Kodak's patents was included in the comprehensive alliance. He drew support for his conclusion from the fact that from the late 1990's to the early 2000's Kodak had asserted claims against a variety of digital camera manufacturers but had not asserted a claim against Pentax.

In April 2003, Yusuke Kojima ("Kojima") was hired by Kodak as Vice President and Chief of Digital Camera Business of the Digital and Applied Imaging Group. In October of 2003, Kojima attended a dinner with Tsuruta and Kiyoshi Kawano ("Kawano") of Pentax in Japan to present a number of business proposals. First, Kojima presented Kodak's proposal to have Pentax participate in Kodak's "ImageLink" consortium. The Kodak ImageLink program was geared toward producing printers with docks for digital cameras, and having program participants incorporate clips onto their digital cameras, so that the cameras could be connected to Kodak printers. The ImageLink program was intended to make it easier for consumers to print their photographs, and thereby drive the purchase of "media" including printing paper and toner. Second, Kojima proposed that Pentax purchase CCD sensors for incorporation into Pentax digital cameras.

During the meeting, Kojima allegedly told Tsuruta that if Pentax agreed to participate in the ImageLink program and purchase Kodak's CCD sensors, Kodak would give Pentax "favorable" or "preferential" patent treatment "in the event that Kodak were ever to assert its digital camera patents against Pentax."  In his deposition, Tsuruta conceded that Kojima told him "that Kodak might assert its patents against Pentax, but if that happened, [Kojima] would work to get Pentax favorable treatment."

In February of 2004, Kodak and Pentax executives attended another trade show of the Photo Marketing Association.  Shortly after the trade show, the executives once again held a dinner meeting in Japan.  This time Kunio Kimeda ("Kimeda"), Kodak Japan's Business Manager of Image Sensor Solution Components Business Group attended the meeting on behalf of Kodak, and Tsuruta attended on behalf of Pentax.  During the dinner, Kimeda allegedly told Tsuruta that "if Pentax would adopt and buy Kodak's CCD sensors for Pentax's medium format cameras then Kodak would grant favorable treatment to Pentax regarding patent royalties in the event that Kodak were ever to assert its digital camera patents against Pentax."  Once again, Tsuruta concedes that Kimeda told him "there was a possibility that Kodak would assert its digital camera patents against Pentax"

but "in the event that that happened, [Kimeda] would work to get Pentax favorable treatment."

During both the October 2003 and February 2004 meetings, there was no discussion of specific patents, of specific products that would be covered by a patent license, of the duration of any patent license, and no agreement on a royalty rate. At least one Pentax representative, however, testified that he believed the royalty rate would be in the vicinity of 1%. Other Pentax representatives have testified that they believed the license would be royalty-free.

At the Photokina conference in 2004, Kodak announced its ImageLink consortium. In a presentation created by Kodak for the conference, Kodak listed Konica Minolta, Nikon, Olympus, Pentax, Ricoh and Sanyo as participants in the consortium.

Subsequently, in September of 2005, Kodak and Pentax executed an ImageLink Agreement which confirmed Pentax's participation in the ImageLink program. In the ImageLink Agreement, Pentax agreed to design, market, and sell digital cameras that could be connected to a Printer Dock. It was also given the option to sell Printer Docks. The ImageLink Agreement contained a section entitled "Intellectual Property." In this section, Kodak and Pentax agreed not to assert their patent rights against each other with respect to the production of

certain ImageLink products.  Specifically, Pentax agreed

> [n]ot to assert any patent rights that it owns and/or
> has the right to sublicense against Kodak or another
> ImageLink licensee for Kodak or licensee's authorized
> implementation of the ImageLink Specifications and/or
> its manufacture, use, or sale, or distribution of
> ImageLink Products.

In return, Kodak agreed

> [n]ot to assert any patent rights that it owns and/or
> has the right to sublicense against Company for
> Company's authorized implementation of the ImageLink
> Specifications with respect to its manufacture, use,
> sale, or distribution of Compliant Printer Dock
> products.

The ImageLink Agreement expressly disclaimed any broad

grant of patent licensing rights by Kodak to Pentax.  The

ImageLink Agreement warned that

> [e]xcept as expressly granted herein, nothing is [sic]
> this Agreement shall be construed to grant or imply to
> grant any rights under any other Kodak patents
> including but not limited to those covering Consumer
> Digital Cameras or other digital camera products.

In a subsequent section entitled "No Implied Right" the

ImageLink Agreement stated that

> [n]o right or license under any patent, copyright,
> trademark, or trade name of either party is granted to
> the other party by, or is to be inferred from, any
> provision in this Agreement except as expressly
> provided herein.

Finally, the ImageLink Agreement provided that it reflected

the companies' "entire agreement:"

> This Agreement sets forth the entire agreement and

7

understanding between Kodak and Company regarding the
subject matter hereof and supersedes any prior
representations, advertisements, statements,
proposals, negotiations, discussions, understandings,
or agreements regarding the same subject matter.
[Pentax] acknowledges that it has not been induced to
enter into this Agreement by any representations or
statements, oral or written, not expressly contained
in this Agreement.

The ImageLink Agreement was signed by Kojima and Pentax's
Senior Executive Officer Ko Torigoe ("Torigoe").  Although
Torigoe has no recollection of discussing patent issues with
Kojima, he believed there was a "mutual understanding that [he]
was doing Kojima a big favor by signing the ImageLink Agreement"
and it "was clear . . . that Kodak would not seek any patent
royalties from Pentax so long as Pentax kept up its good
business relationship with Kodak."  Pentax ultimately produced
four ImageLink-compliant digital cameras, which it began to sell
in roughly 2006.

Meanwhile, Kodak and Pentax's plans with respect to CCD
sensors were also proceeding.  In 2004, Pentax was deciding
between purchasing Kodak's CCD sensors and the CCD sensors of a
Kodak-competitor.  Tsuruta indicates that Pentax ultimately
chose to purchase CCD sensors from Kodak, rather than Kodak's
competitor, because Pentax "had to consider patent issues."  In
October 2004, the companies executed a Letter of Intent which
recognized their "mutual agreement for the development of an 18M

8

pixel, medium format, full frame CCD image sensor." At the same time, Pentax and Kodak also executed a Confidential Disclosure Agreement. Besides containing promises to keep design information confidential, the Confidential Disclosure Agreement acknowledged that neither party "acquire[d] any intellectual property rights" or "assume[d] any obligation . . . to purchase, sell, license, or otherwise transfer any technology, services, or products." Pentax made its first purchase of Kodak's CCD sensors roughly five years later in 2009.

In an email exchange in June of 2010, two Pentax executives discussed an apparent shift in Kodak's plans for generating profit and the likelihood that Kodak would sue Pentax for patent infringement. On June 29, Kazuya Taniguchi ("Taniguchi"), the Manager of Pentax's Intellectual Property Group wrote to Toshiyuki Kitazawa ("Kitazawa"), a General Manager in the Development Department of Pentax's Imaging System ("IS" or "Imaging System") Business Division:

> On the other hand Kodak said in the future it will concentrate its investments on printer business and will reduce supplementing its profit through patent litigation.
>
> I agree with Kodak CEO's words that litigation costs too much money and no one (except for attorneys) will gain profit by it.

Kitazawa responded on the same day, as follows:

> Thank you.  I was afraid up until now that Kodak may
> sue us regarding digital image processing, but this is
> a little bright [news].  It hasn't said anything to
> [the Imaging System Business Division] up until now so
> I think there should be no problem.  Currently we are
> purchasing expensive Kodak sensors for 645D, so we may
> somewhat be defensible.

(first brackets in original).

Subsequently, in an email dated November 24, 2010,

Taniguchi laid out Pentax's position on whether to approach

Kodak about a patent license:

> Since our company IS Division currently <u>has no
> licensing relationship whatsoever</u> with Kodak, we are
> not paying any patent fees.  I think that we would
> have to negotiate and have no choice but to pay some
> amount if Kodak approached us with a license, but at
> this point in time, our policy is not to initiate any
> license discussions.  If we were to negotiate with
> Kodak, I believe that the rate should be lower than
> 3.5% because we would be able to use the patents our
> company owns for a cross license.
>
> There are also other patent issues, and I think that
> we had better clarify the scope of responsibilities
> for both companies.

(Emphasis supplied.)  Pentax's internal documents also

demonstrate that, in February 2011, Pentax was "planning to

cross license with . . . Kodak in the future."  Subsequently, on

October 1, 2011, Ricoh acquired Pentax's digital imaging

division.

The Ricoh-Kodak PLA

In May of 2002, Kodak and Ricoh executed the PLA.  In the

10

PLA, Kodak granted Ricoh a "non-exclusive, non-transferable license . . . to make and Have Made (as hereinafter defined) Ricoh Branded Licensed Products and OEM[1] Licensed Products, and to practice any method or process involved in the manufacture, testing or use thereof, under Kodak Patents."  The term "Kodak Patents" was defined by the PLA to include all types of patents owned or licensable by Kodak, including, but not limited to, specific U.S. Patents and their foreign counterparts.

In the PLA, Ricoh agreed to make a lump sum non-returnable payment to Kodak as "liquidated damages for the sale of Ricoh Branded Licensed Product and OEM Licensed Product from May 19, 1999 through April 30, 2002."  In addition, Ricoh agreed to pay royalties on sales of Licensed Products.  Section 4.2 of the PLA provides

> Ricoh and Kodak mutually acknowledge that Kodak has acquired and will acquire numerous Kodak Patents during the term of the Agreement; that Ricoh currently sells and/or plans to sell a variety of models of Ricoh Branded Licensed Product and OEM Licensed Products during the term of the Agreement; and as a result of the foregoing the administrative burden and cost of determining what constitutes a Ricoh Branded Licensed Product and OEM Licensed Product would be great.

Accordingly, "for the mutual convenience of the parties," it was agreed that Ricoh would pay Kodak commuted royalties based on

---

[1] OEM refers to Original Equipment Manufacturer.

11

the worldwide Net Sales of all Ricoh Branded Licensed Products,
and OEM Licensed Products.

The PLA also accounts for circumstances in which Ricoh
acquires another business after the PLA goes into effect.
Section 4.4, the focus of the parties' dispute, provides

> If Ricoh acquires a business after the Effective Date
> of this Agreement which business was <u>not previously</u>
> <u>licensed by Kodak</u> under Kodak's Patents and <u>for which</u>
> <u>said business had not paid Kodak royalties</u> on Licensed
> Products sold by said acquired business, then Ricoh
> shall, with its next royalty payment following the
> acquisition, remit to Kodak a payment equal to a
> [percentage figure] multiplied by the worldwide Net
> Sales for the acquired business' Licensed Products for
> the period beginning on the Effective Date and ending
> on the acquisition date in addition to paying the
> royalty due under Paragraph 4.2 for sales by such
> acquired business after the acquisition date.

(Emphasis supplied.)  The PLA was executed on and was effective
as of May 1, 2011.

<u>2011: Ricoh's Acquisition of Pentax</u>

Years after entering into the PLA, Ricoh decided to acquire
the digital imaging division of Pentax.  During negotiations
with Pentax, neither Pentax nor its parent Company Hoya ever
told Ricoh that Pentax had a license to use Kodak's patents.  In
addition, a list of Hoya and Pentax's licensing agreements,
disclosed by Hoya to Pentax during negotiations, did not include

Kodak.[2]  Pentax witnesses, however, recall that Ricoh was told that "there was a good relationship between Pentax and Kodak." Following negotiations, Ricoh acquired Pentax's digital imaging division in October of 2011.  Although Pentax had sold digital cameras throughout the entire term of the PLA -- that is, from May 1, 2002 through April 30, 2012 when the PLA expired -- Ricoh has not made any payments to Kodak on Pentax's digital camera sales.

On April 19, 2012, Kodak filed suit against Ricoh.  In its April 19 Complaint, Kodak raises a breach of contract claim and seeks a declaratory judgment that Ricoh breached the PLA.  In its answer filed on June 25, Ricoh raises various defenses to Kodak's claims, including implied license, patent misuse, equitable estoppel, and laches, as well as a request for a declaratory judgment that largely duplicates its defenses.  On May 22, 2013, Kodak filed a motion for partial summary judgment with respect to whether Ricoh breached the PLA.  The motion was fully submitted on August 2, 2013.  On August 8, Kodak filed a notice of supplemental information pertaining to the declaration of Edward Fasano ("Fasano"), Ricoh's expert on digital cameras. Ricoh objected to Kodak's filing of the supplemental

---

[2] Pentax representatives testified that the list reflected only written agreements.

13

information.

DISCUSSION

Before addressing directly the issues raised by Kodak's
motion, it is helpful to begin with a few observations.  The
present action is a suit for breach of a contract, and that
contract happens to be a patent license agreement.  The parties
agree that New York law provides the law of contract that
governs this dispute.[3]  Accordingly, while principles of patent
law may be relevant to and perhaps even determinative of aspects
of the parties' dispute, they are relevant because the parties'
contract and New York's contract law render them relevant.
"Commercial agreements traditionally are the domain of state
law.  State law is not displaced merely because the contract
relates to intellectual property which may or may not be
patentable," so long as that law is "not inconsistent with
federal law."  <u>Aronson v. Quick Point Pencil Co.</u>, 440 U.S. 257,
262 (1979).

As a corollary, not all principles applicable to a suit for
patent infringement apply to a contract claim to recover
royalties.  <u>See, e.g.</u>, <u>ExcelStor Tech. Inc. v. Papst Licensing</u>

---

[3] In addition, the PLA provides that it "shall be governed by the
substantive laws of New York."  Accordingly, New York law will
be applied to the parties' dispute.  <u>See</u> <u>Krumme v. WestPoint</u>
<u>Stevens Inc.</u>, 238 F.3d 133, 138 (2d Cir. 2000).

GMBH & Co. KG, 541 F.3d 1373, 1376 (Fed. Cir. 2008); Speedco, Inc. v. Estes, 853 F.2d 909, 913 (Fed. Cir. 1988); Ballard Med. Products v. Wright, 823 F.2d 527, 530 (Fed. Cir. 1987) ("The scope of a licensed patent may control the scope of a license agreement, but that rule of contract law cannot possibly convert a suit for breach of contract into one 'arising under' the patent laws.").  At the same time, the fact that a doctrine originates in the body of federal patent law, does not mean that it will not find application in state contract law.  Compare Cohn v. Compax Corp., 451 N.Y.S.2d 171, 175 (2d Dep't 1982) (patent misuse is defense to breach of contract); with Eastman Kodak Co. v. GAF Corp., 419 N.Y.S.2d 372, 373 (4th Dep't 1979) (misuse of patents not embodied in license agreement itself, not a defense to suit for royalties).  With this background in mind, the first question to be addressed is whether Kodak is entitled to summary judgment on its claim that Ricoh breached the PLA.

I. Breach of PLA

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(a). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this

15

determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings.  Fed.R.Civ.P. 56(e); accord Sista, 445 F.3d at 169. That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages.  See Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996) (applying New York law). Ricoh does not dispute that the PLA is a valid contract.  It contends, however, that it has not breached the PLA through its

refusal to pay royalties on digital cameras sold by Pentax.  In making this argument, Ricoh relies on its reading of two separate provisions of the PLA, Section 4.4 (which is the after-acquired business provision) and, for a portion of the Pentax products, the PLA's definition of "Digital Cameras."

Under New York law, "[i]t is well settled that a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." MHR Capital Partners LP v. Presstek, Inc., 12 N.Y.3d 640, 645 (2009).  "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Id. (citation omitted).  "In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted). "[A] court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." Amaranth LLC v. J.P. Morgan Chase & Co., 888 N.Y.S.2d 489, 493 (1st Dep't 2009) (citation omitted).  "Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under

the guise of interpreting the writing." Riverside S. Planning

Corp. v. CRP/Extell Riverside, L.P., 13 N.Y.3d 398, 404 (2009)

(citation omitted).

The foregoing principles reflect the "general rule [that]

'parties should be free to chart their own contractual course'

unless public policy is offended." FCI Grp., Inc. v. City of

N.Y., 862 N.Y.S.2d 352, 356 (1st Dep't 2008) (quoting Welsbach

Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y.3d 624, 629 (2006)).

If a contract is unambiguous, its meaning is "a question of law

for the court to decide." JA Apparel Corp. v. Abboud, 568 F.3d

390, 397 (2d Cir. 2009).  Where a contract is susceptible to

multiple interpretations, extrinsic evidence of the parties'

intent shall determine its meaning. Golden Pac. Bancorp. v.

FDIC, 273 F.3d 509, 517 (2d Cir. 2001).  If "the intent of the

parties cannot be determined from the contractual language

itself, the ambiguity presents a question of fact to be resolved

by a jury." Hoyt v. Andreucci, 433 F.3d 320, 331 (2d Cir.

2006).  A court may resolve the ambiguity as a matter of law

only where "there is no extrinsic evidence to support one

party's interpretation of the ambiguous language or if the

extrinsic evidence is so one-sided that no reasonable factfinder

could decide contrary to one party's interpretation." Collins

v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir. 2002) (citation

18

omitted).  Summary judgment may also be granted,

"[n]otwithstanding the existence of contractual ambiguities,"

where "under any of the reasonable interpretations the moving

party would prevail.  In such a case, the non-movant will have

failed to show that there is any issue of material fact for

trial."  Chock Full O'Nuts Corp. v. Tetley, Inc., 152 F.3d 202,

204 (2d Cir. 1998).

A. Existence of License

The parties' first dispute involves the after-acquired

business provision reflected in Section 4.4 of the PLA, and

Ricoh's assertion that Pentax had an implied license to use

Kodak's patents.  The language of Section 4.4 is repeated here

for ease of reference:

> If Ricoh acquires a business after the Effective Date
> of this Agreement which business was not previously
> licensed by Kodak under Kodak's Patents and for which
> said business had not paid Kodak royalties on Licensed
> Products sold by said acquired business, then Ricoh
> shall, with its next royalty payment following the
> acquisition, remit to Kodak a payment equal to [a
> percentage figure] multiplied by the worldwide Net
> Sales for the acquired business' Licensed Products for
> the period beginning on the Effective Date and ending
> on the acquisition date in addition to paying the
> royalty due under Paragraph 4.2 for sales by such
> acquired business after the acquisition date.

(Emphasis supplied.)

It is undisputed that Ricoh acquired Pentax after the

Effective Date of the PLA, that Pentax sold digital cameras that

19

fall within the PLA's definition of "Licensed Products" throughout the duration of the PLA, that Pentax did not pay royalties to Kodak on sales of its digital cameras, and that Ricoh has not paid any royalties to Kodak on Pentax's digital camera sales.  It is also undisputed that Kodak and Pentax never entered into an express license agreement, whether oral or written, at any time.  Thus, the only issue that arises under Section 4.4 is whether Pentax may have had an implied license from Kodak to use Kodak's patents.  In the absence of such a license, Ricoh will have breached the unambiguous language of Section 4.4.

With respect to the question of whether Pentax was "previously licensed by Kodak" the parties agree that the term "licensed" in the PLA refers to a patent license as that concept is understood under federal patent law.  Consistent with this understanding, the parties' briefs rely almost entirely on Federal Circuit case law in arguing that Kodak did or did not license Pentax to use Kodak patents.  Where, as here, a contract incorporates by its own terms a concept of patent law, it is appropriate to rely on federal patent law precedent in defining the relevant term.  See St. Joseph Iron Works v. Farmers Mfg Co., 106 F.2d 294, 296 (4th Cir. 1939) (meaning of term "license" in patent licensing contract).

Under federal patent law, a license must be understood in relation to the rights inherent in a patent.  "A patent grants its owner the right to exclude others from making, using, or selling the patented invention." Carborundum Co. v. Molten Metal Equip. Innovations, Inc., 72 F.3d 872, 878 (Fed. Cir. 1995).  Although most patent licenses are express, they can also be implied.  Id.  "[A]n implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." Wang Labs. Inc. v. Mitsubishi Elec. America, Inc., 103 F.3d 1571, 1580 (Fed. Cir. 1997).  As the Supreme Court explained in De Forest Radio Tel. Co. v. United States, 273 U.S. 236 (1927),

> [n]o formal granting of a license is necessary in order to give it effect.  Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license. . . .

Id. at 241.  A court will imply a license only rarely.  Wang, 103 F.3d at 1581.  In the few instances in which implied patent licenses have been found, the courts have usually relied on the doctrine of implied license by equitable estoppel.[4]  Id.; Stickle v. Heublein, Inc., 716 F.2d 1550, 1559 (Fed. Cir. 1983).

---

[4] This doctrine is distinct from equitable estoppel, which is discussed in a later section of this Opinion.

21

> An implied license by equitable estoppel requires
> proof that (1) the patentee, through statements or
> conduct gave an affirmative grant of consent or
> permission to make, use, or sell to the alleged
> infringer, (2) the alleged infringer relied on the
> statement or conduct, and (3) the alleged infringer
> would, therefore be materially prejudiced if the
> patentee is allowed to proceed with its claim.

Windbond Elec. Corp. v. Int'l Trade Comm'n, 262 F.3d 1363, 1374

(Fed. Cir. 2001).  The first element of implied license by

equitable estoppel "requires the patentee to communicate that

the accused infringer will not be disturbed by the plaintiff

patentee in the activities in which the former is currently

engaged."  Id.  Ultimately, an implied license, like all

contracts, requires a "meeting of the minds."  Duval Sulphur &

Potash Co. v. Potash Co. of Am., 244 F.2d 698, 701 (10th Cir.

1957).  "Thus, an implied license cannot arise out of the

unilateral expectations or even reasonable hopes of one party."

Stickle, 716 F.2d at 1559.

Kodak has shown through undisputed evidence that Kodak did

not, through words or conduct, affirmatively grant Pentax a

license to use Kodak's patents.  The entire course of conduct

between Kodak and Pentax reveals nothing more than a close and

cooperative business relationship.  Naturally, a willingness to

work cooperatively and pursue mutually beneficial business

ventures does not automatically translate into a grant of

intellectual property rights.  See Stickle, 716 F.2d at 1554;

Gen. Elec. Co. v. Continental Lamp Works, 280 F. 846, 850 (2d

Cir. 1922).  As the record reflects, Kodak and Pentax's

relationship was shaped by two principal business ventures:

Pentax's participation in Kodak's ImageLink program and its

purchase of CCD sensors.[5]  It is undoubtedly true that Kodak and

Pentax representatives would have, as a result of these

ventures, interacted frequently and, by all accounts, Kodak and

Pentax had a "very good relationship."  Nonetheless, the fact

that companies maintain a positive relationship as they conduct

business does not mean that they have affirmatively granted each

other the right to utilize and capitalize on their respective

intellectual property.

Ricoh has not presented evidence that creates a question of

fact in this regard.  The various conversations and business

endeavors to which Ricoh points, whether considered individually

or as a whole, do not include any words spoken or conduct

exhibited by Kodak from which Pentax could have "properly

inferred consent" to use Kodak's library of patents for digital

cameras.  This conclusion is compelled by a number of

circumstances.  First, throughout the companies' nearly ten year

---

[5] Kodak and Pentax also participated in trade organizations
together and cooperated in establishing a joint Kodak-Pentax
photography club.

relationship, patents were scarcely mentioned.  Indeed, Pentax's
General Manager of the Imaging Systems Business Division,
Tsuruta, could recall only two instances in which anyone from
Kodak even referred to patents.  According to Pentax's
President, Urano, when Kodak and Pentax first committed their
companies to exploring a comprehensive business alliance, the
idea of a patent license was "not even raised as a theme."

Second, although a number of Pentax representatives
testified to a belief that that Kodak had granted Pentax a
license to use Kodak patents, the "unilateral expectations or
even reasonable hopes" of one party will not create an implied
license.  Stickle, 716 F.2d at 1559.  Moreover, most, if not
all, of the Pentax representatives who so testified based their
belief on discussions that they believed took place between
Kodak and Pentax executives at the March 2002, October 2003, and
February 2004 meetings.  As recounted above, however,
discussions of patent licensing in these meetings were either
nonexistent or brief and generalized.  Indeed, the most specific
statements pertaining to patent licensing come from Tsuruta's
recounting of statements made by Kojima and Kimeda at the
October 2003 and February 2004 dinner meetings.  With respect to
both conversations, Tsuruta acknowledges that the Kodak
executives indicated that there was a possibility that Kodak

24

would assert its patents against Pentax.  Tsuruta recalls only
that the Kodak executives offered to arrange or to work to
arrange preferential or favorable patent treatment in the event
that Kodak did so.  No one could reasonably infer from these
preliminary discussions that Kodak had affirmatively granted
Pentax the right to use Kodak's entire patent portfolio without
making royalty payments for an indefinite period of time.

Nor could one reasonably infer that an implied license was
created through the specific business ventures Kodak and Pentax
pursued together.  Quite the contrary.  Through the ImageLink
program, Pentax produced four digital cameras that were capable
of being connected to Kodak printers and also may have sold some
Kodak-designed Pentax-branded printers with digital camera
docks.[6]  The 2005 ImageLink Agreement was explicit, however, that
the ImageLink Agreement constituted the entire agreement with
respect to the ImageLink program, and that no intellectual
property rights besides those expressly provided for in the
ImageLink Agreement had been transferred.

Similarly, the 2004 Confidential Disclosure Agreement

---

[6] The ImageLink Agreement permitted Pentax to sell ImageLink
compliant Printer Docks if Pentax "(a) purchase[d] all Compliant
Printer Docks from a certified ImageLink Printer Dock
Manufacturer; or (b) bec[a]me a certified ImageLink Printer Dock
manufacturer under a separate agreement with Kodak."

executed in connection with Kodak's agreement to sell CCD
sensors to Pentax explicitly acknowledged that neither Kodak nor
Pentax was acquiring any intellectual property rights.[7]  At best,
some of the evidence suggests that Pentax hoped that purchasing
CCD sensors from Kodak would assist Pentax in dealing with Kodak
patent issues.  Nothing in the record suggests, however, that
those hopes or beliefs were founded upon an affirmative grant of
consent from Kodak.

Ricoh faces another obstacle in presenting its contention
that there was an implied license created by the October 2003
conversation with Tsuruta and Kawano and the February 2004
conversation with Tsuruta.  As articulated by Tsuruta, Kodak's
preferential treatment of Pentax was conditioned on Pentax
participating in the ImageLink program and purchasing CCD
sensors.  Where a purported offer of a license is conditioned on
certain action taking place, the license does not arise unless

---

[7] Kodak is not seeking royalties for Pentax's use of Kodak's CCD
sensors.  Under federal patent law an implied license can arise
when a patentee sells a nonpatented product that is used to
practice a patented invention.  In order for such an implied
license to arise, there must be no non-infringing use for the
product and the "circumstances of the sale must plainly indicate
that the grant of a license should be inferred."  Carborundum,
72 F.3d at 878 (citation omitted).  Even where such licenses are
found, "[u]nless the circumstances indicate otherwise, an
implied license arising from sale of a component to be used in a
patented combination extends only for the life of the component
whose sale and purchase created the license."  Id. at 879.

26

and until those actions take place.  See Winbond Elec. Corp.,
262 F.3d at 1375.  Although Kodak announced Pentax as a
participant in the ImageLink consortium in 2004, Pentax did not
sign the ImageLink Agreement until 2005, and did not produce any
ImageLink compliant cameras until 2006.  Furthermore, although
Pentax and Kodak signed a Letter of Intent with respect to CCD
sensors in October of 2004, Pentax did not purchase any sensors
until 2009.  And, again, as just described, the documents
executed in connection with both of those programs explicitly
rejected the grant of Kodak licensing rights that would be
necessary to cover Pentax digital cameras.

Similarly, a "common thread" that runs through implied
license by equitable estoppel cases is that the alleged
infringer must have been led to take action because of the
patentee's statements or conduct.  See Bandag Inc. v. Al
Bolser's Tire Stores, Inc., 750 F.2d 903, 925 (Fed. Cir. 1984)
(citation omitted).  There is no suggestion in the record,
however, that Pentax "commit[ted] any infringing acts or" became
"committed to a course of infringing action" because of Kodak's
words or conduct.  Stickle, 716 F.2d at 1559.  The only actions
allegedly taken by Pentax in reliance on Kodak's words or
conduct were the decisions by Pentax to participate in the
ImageLink Program and to purchase CCD sensors.

There is ample evidence in the record, on the other hand, that Pentax did not in fact believe that it had an implied license from Kodak, and thus it could not have reasonably relied on such a license to its detriment.  For instance, as of 2010, the Manager of Pentax's Intellectual Property Group acknowledged that Kodak and Pentax had "no licensing relationship whatsoever."  Contemporaneous documents also reflect that Pentax was "afraid" that Pentax may be sued by Kodak for patent infringement,[8] and that it was planning to "cross license with . . . Kodak . . . in the future."  None of these circumstances are consistent with a finding that Pentax relied on Kodak's statements or conduct to take action that would subject it to prejudice.

In sum, Kodak has demonstrated that that Pentax was "not previously licensed" under Kodak patents, and Ricoh has failed to respond with evidence raising a genuine issue of fact with respect to whether Pentax was so licensed.  Accordingly, because Pentax was not previously licensed by Kodak under Kodak patents, Ricoh's failure to pay any royalties on Pentax's digital cameras sold during the term of the PLA constitutes a breach of that

---

[8] In his deposition, Kitazawa -- the writer of this email -- retreated from his email explaining that although he stated that he was afraid that Kodak would sue Pentax, he was not really afraid, but that it was his job to be attuned to risks.

agreement.

B. Additional Issues of Contract Interpretation

In an innovative argument, Ricoh contends that Kodak may only recover royalties from Ricoh under Section 4.4 of the PLA if Kodak could have successfully obtained royalties from Pentax in a patent infringement action.  Since, according to Ricoh, Kodak's suit for patent infringement against Pentax would have been barred by laches or equitable estoppel, it cannot obtain royalties from Ricoh.  In support of this position, Ricoh has submitted the report of Carl Silverman ("Silverman"), an expert in patent licensing.  This argument fails for the several reasons described below.  But, first and foremost, it fails because this is a breach of contract action brought against Ricoh and not a patent infringement action filed against Pentax. Having shown that Ricoh has breached the PLA, Kodak has no additional burden to show that it could have succeeded as well in a separate suit against Pentax for infringement.

In order to address Ricoh's position, it is useful to once more consider the language of Section 4.4:

> If Ricoh acquires a business after the Effective Date
> of this Agreement which business was not previously
> licensed by Kodak under Kodak's Patents and for which
> said business had not paid Kodak royalties on Licensed
> Products sold by said acquired business, then Ricoh
> shall, with its next royalty payment following the
> acquisition, remit to Kodak a payment equal to [a

> percentage figure] multiplied by the worldwide Net
> Sales for the acquired business' Licensed Products for
> the period beginning on the Effective Date and ending
> on the acquisition date in addition to paying the
> royalty due under Paragraph 4.2 for sales by such
> acquired business after the acquisition date.

(Emphasis supplied.) Section 4.4, plainly stated, requires Ricoh to make a payment to Kodak, calculated on the basis of the worldwide Net Sales of the acquired business' "Licensed Products," whenever it acquires a business after May 1, 2002 that "was not previously licensed by Kodak under Kodak's Patents and for which said business had not paid Kodak royalties on Licensed Products sold by said acquired business." Ricoh is unable to point any language in Section 4.4 that should be or could be read to impose upon Kodak the burden to show that it could have collected the royalties as well from the acquired business.[9] Adopting Ricoh's interpretation would require a redrafting of the parties' agreement.

In addition to being entirely detached from any plain meaning reading of Section 4.4, Ricoh's interpretation would not make the PLA more "commercially reasonable," despite Ricoh's contention that it would. If Section 4.4 were read to mean that

---

[9] The expert report of Silverman appears to place emphasis on the words "acquired business," although it does not attempt to explain how the words "acquired business" can be read as limited to only those businesses acquired by Ricoh from which Kodak could have recovered royalties in a suit for patent infringement.

Ricoh need not make any payment to Kodak for the digital camera sales of an acquired business unless Kodak could have succeeded in a suit for patent infringement against the acquired business, the task of determining which acquired businesses constitute such exempt businesses would become daunting.   The impracticality of Ricoh's interpretation is revealed by considering Ricoh's position that it need not make a Section 4.4 payment for the digital camera sales of an acquired business if, for example, Kodak's patent infringement claim against the acquired business would/might have been barred by doctrines such as laches or equitable estoppel.   In other words, in order for Ricoh to determine whether a payment was due under Section 4.4, it would have to hypothesize whether, if Kodak had sued the acquired business for patent infringement, the acquired business would have been able to prove that Kodak's suit was barred by either laches or equitable estoppel.   Each of these defenses, of course, is an exceedingly fact bound inquiry and there is no reason to assume that Ricoh would have had access to the facts that would permit it to make a reliable judgment about a hypothetical lawsuit's outcome.[10]

---

[10] Taking the hypothetical laches defense as an example, Ricoh would first have to determine when Kodak might have become aware of the infringing conduct of the acquired business.  See A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1032-35

Finally, Ricoh points to Kodak's concession that it does not seek royalties from Ricoh for any of Pentax's products that Pentax purchased from an Original Equipment Manufacturer that is licensed under Kodak's patents.  As Ricoh points out, the plain language of Section 4.4 requires Ricoh to pay royalties on Pentax products even if Pentax originally purchased the products from a Kodak licensee who paid a royalty to Kodak on the sale to Pentax.  Accordingly, Ricoh argues, even Kodak must be conceding that it has a burden to show a right to a royalty beyond those requirements set out in the PLA.

Kodak's concession that it will not seek a double recovery of licensing fees through this breach of contract action is not surprising and does not constitute a concession that the PLA's plain terms do not apply.  Under the federal doctrine of patent exhaustion "the unrestricted sale of a patented article, by or

---

(Fed. Cir. 1992) (describing laches defense).  If Ricoh determined that Kodak had not been aware of the infringing conduct of the acquired business for at least six years, then it would have to consider whether the acquired business could nevertheless have shown that Kodak's delay in filing suit was unreasonable and that the acquired business was prejudiced by the delay.  Even if Ricoh concluded that Kodak had been aware of the infringing conduct for at least six years, which would raise a presumption of laches, Ricoh would still have to consider whether Kodak would have been able to rebut the presumption by showing a reasonable excuse for the delay or that the acquired business had not in fact been prejudiced.  Suffice it to say that Section 4.4 is not "commercially unreasonable" for failing to adopt this royalty calculation scheme.

with the authority of the patentee, exhausts the patentee's
right to control further sale and use of that article by
enforcing the patent under which it was first sold."
Anton/Bauer, Inc. v PAG, Ltd., 329 F.3d 1343, 1349 (Fed. Cir.
2003) (citation omitted).  The patent exhaustion doctrine,
however, does "not necessarily limit" a patentee's "other
contract rights," and a conclusion that a patentee would not be
entitled to "patent damages" as a result of patent exhaustion
does not amount to a determination that contract damages are
likewise unavailable.  Quanta Computer, Inc. v. LG Elecs., Inc.,
553 U.S. 617, 637 n.7 (2008);[11] see also ExcelStor Tech. Inc, 541
F.3d at 1376.  Nonetheless, the fact that a patentee has already
received a royalty payment on the sale of a licensed product may

---

[11] In Quanta, 553 U.S. 617, the Supreme Court held that the
authorized sale of a component part that must be combined with
other parts to practice a patented method and is capable of use
only in practicing the patent, exhausts the patentee's patent in
the patented method.  Id. at 630-37.  In a footnote, the Court
"note[d] that the authorized nature of the sale to [the alleged
infringer] does not necessarily limit [the patentee's] other
contract rights.  [The patentee's] complaint does not include a
breach-of-contract claim, and we express no opinion on whether
contract damages might be available even though exhaustion
operates to eliminate patent damages."  Id. at 637 n.7; see also
Keller v. Standard Folding Bed Co., 157 U.S. 659, 666 (1985)
("Whether a patentee may protect himself and his assignees by
special contracts brought home to the purchasers is not a
question before us, and upon which we express no opinion.  It
is, however, obvious that such a question would arise as a
question of contract, and not as one under the inherent meaning
and effect of the patent laws.").

affect the calculation of damages the licensor has incurred as a result of its licensee's breach of the patent license agreement. See Discovision Assoc. v. Toshiba Corp., 08 Civ. 3693 (HB), 2009 WL 1373915, *9 (S.D.N.Y. May 18, 2009), order amended on denial of reconsideration, Discovision Assocs. v. Toshiba Corp., 08 Civ. 3693 (HB), 2009 WL 19045118 (S.D.N.Y. June 30, 2009). Kodak's admission that it will not seek a double recovery of damages, therefore, will not be construed as an admission that its burden to show a breach of the PLA requires it show as well that it could prevail in any patent infringement action against Pentax or any other company acquired by Ricoh.[12]

C. Meaning of "Digital Camera"

The parties' third dispute regarding the existence of a breach focuses on the meaning of "Digital Camera" as that term is defined in the PLA.  In particular, the parties disagree whether Pentax's DSLR cameras constitute "Digital Cameras" within the meaning of the PLA.  Most of the cameras sold by Pentax during the duration of the PLA were point-and-shoot

---

[12] Even if Kodak's concession were construed as evidence that Kodak interprets Section 4.4 to impose a burden to show a right to a royalty beyond those requirements set out in that section, it is at best extrinsic evidence of the meaning of that section. But, because Section 4.4 unambiguously permits Kodak to recover royalties without proving that it could have succeeded in a suit for patent infringement against the acquired business, there is no basis to consider extrinsic evidence of the provision's meaning.

34

cameras and are unaffected by this dispute.  Kodak seeks to have those sales of DSLR cameras in which the DSLR camera body and lens are sold together classified as sales of Digital Cameras under the PLA.

As described above, the PLA requires Ricoh to make royalty payments to Kodak based on the worldwide Net Sales of certain "Licensed Products."  The term "Licensed Product" is defined in the PLA to include "Digital Camera(s)," and the term "Digital Camera" is itself defined to mean

> [a] portable, self-contained device utilizing an Area Image Sensor having at least 300,000 pixels, as well as electronics and optical elements that captures still or motion images of visible radiation and (a) records a digital signal representing such images on a Removable Digital Storage Media or (b) stores at least two such images in internal memory.

(Emphasis supplied.)  Ricoh contends that Pentax's DSLR cameras do not constitute "Digital Cameras" within the meaning of the PLA because they are neither "portable" nor are they "self-contained."

As described by Fasano, Ricoh's expert on digital cameras, a DSLR camera is a camera that "uses the same lens to view the image and to capture the image."  Because the camera uses a single lens the "image seen by a DSLR camera user is identical to the image that will be captured by the sensor."  This differentiates DSLR cameras from point-and-shoot cameras, which

represent the largest segment of the digital camera market.  The
user of a point-and-shoot camera, when using either the optical
viewfinder or LCD screen of the camera, sees an image that is
slightly different than the image that is captured by the
camera's sensor.  This phenomenon is called parallax error, and
it is eliminated in DSLR cameras by use of the single lens.

DSLR cameras are also different from point-and-shoot
cameras because a consumer can detach and change the lens on the
DSLR camera.  The DSLR camera body and the interchangeable lens
do not function independently; they must be combined to capture
images.  DSLR cameras are also larger and heavier than point-
and-shoot cameras.  Thus, when a DSLR camera body and lens are
connected, the camera may weigh around five pounds.  With this
background in mind, the Court turns to the PLA's definition of
"Digital Camera."

The main points of contention between the parties regarding
whether DSLR cameras constitute digital cameras within the
meaning of the PLA surround the meaning of the words "portable"
and "self-contained."  Standard dictionaries define the term
portable as "capable of being carried or moved about," and as
"able to be easily carried or moved."  The term portable is
commonly used to describe technological devices, such as
"portable computers," and "portable televisions."  See Computer

<u>Docking Station Corp. v. Dell, Inc.</u>, 519 F.3d 1366, 1375 (Fed. Cir. 2008) (defining "portable computer" as a computer "that is capable of being moved or carried about"); <u>Anton/Bauer</u>, 329 F.3d at 1347 ("portable television video cameras").

It is undisputed that DSLR cameras are "capable of being carried," but Ricoh argues nonetheless that they are not portable because those consumers who prefer point-and-shoot cameras often list that camera's superior portability as a reason for their preference.  This effort to characterize DSLR cameras as non-portable utterly fails.  The mere fact that one device is lighter or less bulky than another does not render the latter device non-portable.  While the portability of an item undoubtedly resides along a sliding scale, the portability of the DSLR cameras at issue here simply does not present a close call.  Under any reasonable interpretation of the term portable, the DSLR cameras would be understood to be portable.

The word "self-contained" is ordinarily defined as meaning "complete in itself" or "complete, or having all that is needed, in itself."  Kodak argues that DSLR cameras -- when the camera body and lens are sold in a "kit" -- are self-contained because, as Ricoh's corporate designee has conceded, when the DSLR camera body and lens are connected to each other, the camera is a "complete" picture-taking device.  Ricoh emphasizes that neither

37

the DSLR camera body nor the lens is capable of capturing an image as the "Digital Camera" definition requires.  When the two components are combined, Ricoh continues, they are not "self-contained" because they are two components.

It is impossible to resolve this dispute without evidence of how DSLR camera bodies and lenses are sold and, in particular, whether they are ever sold in the same box.  In its memorandum of law, Kodak claims that it is only seeking royalties on DSLR cameras when the camera body is sold "with a lens."  Ricoh responds that "[n]o Pentax DSLR system is sold with a Pentax interchangeable lens already attached to a DSLR camera body -- or even packaged in the same box."  In reply, Kodak contends that it is "undisputed that Pentax sold DSLRs with lenses, including as part of a kit."  The evidence cited by the parties in support of their respective positions does not provide clarity about what it means for a DSLR camera to be sold "in a kit" and whether, in fact, any DSLR camera bodies are ever sold in the same box as a lens.[13]  Because of the dearth of

---

[13] The parties have only referred to statements of their experts on this issue.  Ricoh cites to the declaration of Fasano, its expert on digital cameras.  In his declaration Fasano explains that "as confirmed to [him] by Mr. Kazumichi Eguchi, Ricoh Company Ltd., in a telephone call on June 20, 2013, in no instance does Pentax combine two individual DSLR camera system components by attaching a Pentax interchangeable lens to a DSLR camera body and packaging such a combination for sale as a

admissible evidence in the record on this point, the Court declines to determine whether DSLR cameras are "self-contained" within the meaning of the PLA.  Accordingly, Kodak's motion for summary judgment on the issue of whether DSLR cameras constitute "Digital Cameras" within the meaning of the PLA is denied.


## II. Ricoh's Affirmative Defenses

Kodak has also moved for summary judgment on three of Ricoh's affirmative defenses.  They are the defenses of patent misuse, equitable estoppel, and laches.  Kodak has shown that it is entitled to summary judgment on each of these defenses.

### A. Patent Misuse

Ricoh has asserted an affirmative defense based on a theory of patent misuse.  This defense rests on one exchange between Ricoh and Kodak in the concluding days of their negotiations of the PLA.

---

single product."  Kodak, in turn, cites to a portion of the report of Vincent Thomas ("Thomas"), Kodak's damages expert, in which Thomas states that "[Pentax] sold other SLR digital cameras with lenses, including as part of a 'kit.'"  In support of this proposition, Thomas' report cites to "Appendix D1." Kodak has not provided the Court with Thomas' entire expert report, and in particular, has not submitted Appendix D1.  Kodak also cites to a portion of the report of Brian C. Becker ("Becker"), who appears to be Ricoh's damages expert.  In the excerpt provided to the Court, Becker states that it is his "understanding that only those DSLRs listed in the sales data with the terms 'lens,' 'zoom,' or z00m' are those that are sold with lenses."

Kodak and Ricoh began negotiating a patent license agreement in roughly 1999.  Prior to entering into the PLA in May 2002, Ricoh expressed displeasure with a number of the PLA's provisions, including the royalty formula, in an April 4, 2002 email to Kodak:

> After our meeting on March 20, 2002, we have referred your revised proposal, to our business division for their internal study, the revised proposal being in principle that [Software Distribution Agreement] packaging fee will be increased to 0.5% and initial payment be reduced by 10%.
>
> Although repeatedly mentioned to you, we wish to explain here again our situation, so that all the Kodak people can understand us.
>
> First, we would like you to understand that Ricoh's digital camera business is really facing difficult situation, which may be similar to the time when Ricoh discontinued analogue camera distribution in America. As a matter of fact, Ricoh's sales in USA were only about 1000 units for 2001, and in the near future, too, Ricoh cannot expect any quick recovery of sales from this rock bottom situation, with no established camera distribution network in America.
>
> Also, our people are greatly dissatisfied with the unprecedented calculation method of the commuted royalty, or royalties are to be paid on world-wide sales without regard to existence of patents.
>
> Because of the foregoing circumstance, while we appreciate Kodak's concessions made this time, we cannot persuade our business division to accept your latest proposal and would be obliged to propose the following terms and conditions, which is the best we can offer to keep the business plan to stand:
>
> (Ricoh Counter Proposal)

(1)  SDA packaging fee
     SDA packaging fee be increased from 0.5% to 0.8%,
     which may become 0.5% again under certain conditions.
(2)  Initial payment
     50% reduction from the calculated amount of 2.5%
     royalty rate basis.
(3)  Termination
     In the case of Ricoh's withdrawal or termination of
     its digital camera business in America within 2 years
     from the execution date of the agreements, Ricoh has a
     right to terminate PLA and SDA.

(Emphasis supplied.)

     In response, Sus Cho of Eastman Kodak sent the following

email on April 4:

     I would like you and your colleagues to know that we
     do understand and are sensitive to the very difficult
     circumstances your digital business is under.
     However, as we, too, have repeatedly explained to you,
     Kodak's digital camera licensing program is worldwide
     with uniform terms, conditions and rates, adjusted in
     accordance with the value of the licensee's patents
     cross licensed to Kodak.

     I was, therefore, disappointed to receive Ricoh's
     counter proposal at this late stage which would
     require restructuring of the licensing program and re-
     negotiation with our existing licensees.  I feel that
     I personally explained to you and Messrs. Takiguchi
     and Shinoda at our last meeting on March 20 that the
     tentative offers made by ATLC would be the best offer
     we can offer Ricoh consistent with the licensing
     program's principles.  I was truthful when I stated so
     at that time because our flexibility to negotiate
     different terms, conditions and rates has greatly
     diminished as we have signed additional licenses
     during our long negotiations with Ricoh.  Your counter
     proposal is unacceptable to us.  Kodak must protect
     its patent licensing program, the value of which has
     been clearly established in the marketplace

     Please carefully consider the following two

41

alternatives that you have under your control:

(1)   If you let us know by the end of business on Friday,
      April 5, Japan time, by e-mail that you can accept the
      following basic terms for the Patent License Agreement
      and the Software Distribution Agreement, we will be
      able to amicably conclude these agreements that we
      have negotiated for the last 2 years and 9 months.
      PLA:
      a.  2.5% commuted, worldwide royalty rate
      b.  10 year term
      c.  past damages 10% reduction from the calculated amount
          of 2.5% royalty basis
      SDA:
      a. Packaging fee of 0.5% of net sales of qualifying Ricoh
         digital cameras.  Timing of past damages payments is
         negotiable.

(2)   If the first alternative is not acceptable, you are
      leaving us with no alternative but to take legal
      action.  In this event, a lawsuit will be commenced as
      soon as we have completed the required legal due
      diligence.
      . . . .

      THE CHOICE IS YOURS.

A patent vests the owner with a "legal monopoly" that gives

the owner "the right to invoke the State's power to prevent

others from utilizing his discovery without his consent."

Zenith Radio Corp. v. Hazeltine Research, Inc. 395 U.S. 100, 135

(1969).  A patent owner is entitled to "exact royalties as high

as he can negotiate" for a license to practice his patents.

Princo Corp. v. Int'l Trade Comm, 616 F.3d 1318, 1327 (Fed. Cir.

2010) (citation omitted).  There are, however,

      established limits which the patentee must not exceed
      in employing the leverage of his patent to control or

42

> limit the operations of the licensee.  Among other
> restrictions upon him, he may not condition the right
> to use his patent on the licensee's agreement to
> purchase, use, or sell, or not to purchase, use or
> sell another article of commerce not within the scope
> of his patent monopoly.

<u>Zenith</u>, 395 U.S. at 136.

Thus, the "basic rule of patent misuse [is] that the patentee may exploit his patent but may not use it to acquire a monopoly not embraced in the patent." <u>Princo Corp.</u>, 616 F.3d at 1327.  Under this logic, a royalty provision calculated based on the total product sales of a licensee may constitute patent misuse if not all of the products sold by the licensee practice the patent, and the patentee conditions the provision of a license on the licensee's acceptance of the royalty provision. On the other hand, "[i]f convenience of the parties rather than patent power dictates a total-sales royalty provision, there are no misuse for the patents and no forbidden conditions attached to the license." <u>Zenith</u>, 395 U.S. at 138.  Accordingly, parties may agree to avoid the administrative burden of distinguishing between sales of products employing the patentee's patent and sales that do not in the calculation of royalty payments, but a licensee "may insist upon paying only for use, and not on the basis of total sales." <u>Id.</u> at 139.  Where a licensee proposes to pay only for its actual use, the patentee's "insistence on a

43

percentage-of-sales royalty, regardless of use, and his rejection of licensee proposals to pay only for actual use" would constitute patent misuse.  Id.

Ricoh contends that Kodak conditioned its provision of a license to its patent portfolio on Ricoh's acceptance of the worldwide net sales royalty provisions in Sections 4.2 and 4.4 of the PLA.  The parties do not dispute that, by selecting worldwide net sales as the basis for royalty payments, Sections 4.2 and 4.4 of the PLA require Ricoh to make payments on digital cameras regardless of whether the cameras employ Kodak's patents or are sold in countries to which Kodak's patent power does not extend.  But, it is also undisputed that Kodak's patent portfolio includes foreign patents as well as U.S. patents.  Thus a provision calculating royalties on the basis of U.S. sales alone would unnecessarily narrow "the physical . . . scope" of Kodak's patent portfolio.  Princo Corp., 616 F.3d at 1328.  In addition, because Kodak's patent portfolio includes U.S. and foreign patents, the administrative burden of distinguishing sales properly covered by patents and those that are not is greater than would be the case if Kodak owned only U.S. patents.  In fact, the PLA contained a clause that explicitly recognized that "the administrative burden and cost of determining" what constitutes a Licensed Product "would be

44

great" and that, accordingly, royalties would be calculated on the basis of worldwide net sales "for the mutual convenience of the parties."

Ricoh has not shown that Kodak engaged in patent misuse, or raised a triable question of fact in support of this defense. Instead, Ricoh requested a reduction in the amount due for "back royalties," to modify a separately executed "Software Distribution Agreement," and to add an early termination provision in both the Software Distribution Agreement and the PLA that would permit Ricoh to terminate the agreements if it withdrew from the digital camera business in the United States within two years of the execution of the agreements.  None of these requests can be construed as a proposal by Ricoh to pay for its actual use.  Even the proposed termination provision relieving Ricoh of royalty obligations should it withdraw from the U.S. market is not equivalent to a request to pay for actual use since Kodak's patents extended to products sold in some foreign markets.  Although a patentee may not insist on a "percentage of sales royalty" in the face of a licensee's proposal to pay for actual use, nothing in the patent misuse doctrine requires a patentee to negotiate with itself by providing alternative royalty provisions that were never requested.  In sum, Ricoh has not shown that Kodak conditioned

45

"the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent."  Zenith Radio Corp., 395 U.S. at 135.

## B. Equitable Estoppel

Ricoh relies on the affirmative defense of equitable estoppel.  It asserts that Kodak's conduct vis-a-vis Pentax permits Ricoh to rely on this defense in this action.  Ricoh is wrong, for several reasons.

In order to show equitable estoppel under New York law, the defendant must show that the plaintiff (1) made a false misrepresentation or concealed material facts; (2) intended that the defendant act based on that conduct; and (3) knew the actual facts.  Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996).  In addition, the defendant must show that (1) it did not know the true facts; (2) it reasonably relied on the conduct of the plaintiff; and (3) it was prejudiced by its change of position.  Id. at 302; see also Buttry v. General Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995); Bennett v. United States Lines, Inc., 64 F.3d 62, 65 (2d Cir. 1995).

Equitable estoppel is

> imposed by law in the interest of fairness to prevent
> the enforcement of rights which would work fraud or
> injustice upon the person against whom enforcement is
> sought and who, in justifiable reliance upon the
> opposing party's words or conduct, has been misled

> into acting upon the belief that such enforcement
> would not be sought.

Readco, 81 F.3d at 301 (quoting Nassau Trust Co. v. Montrose
Concrete Prods. Corp., 56 N.Y.2d 175, 184 (1982)).  Equitable
estoppel functions to "preclude[] a party at law and in equity
from denying or asserting the contrary of any material fact
which he has induced another to believe and to act on in a
particular manner."  Holm v. C.M.P. Sheet Metal Inc., 455
N.Y.S.2d 429, 433 (4th Dep't 1982); see also Cadlerock L.L.C. v.
Renner, 898 N.Y.S.2d 127, 127 (1st Dep't 2010).  While equitable
estoppel can be invoked in actions at law, it only affords an
equitable remedy -- not damages.  See Clifford R. Gray Inc. v.
Le Chase Const. Servs. LLC, 819 N.Y.S.2d 182, 186 (3d Dep't
2009).

Ricoh's equitable estoppel defense is curiously constructed
because it relies on Kodak's supposedly misleading conduct
toward Pentax and not on any misleading conduct exhibited to
Ricoh.[14]  Ricoh does not claim that Kodak ever told Ricoh that it

---

[14] Ricoh discusses equitable estoppel in connection with issues
of implied license, suggesting either a conflation of the two
distinct doctrines, or that Ricoh believes Kodak must disprove
equitable estoppel as an element of its prima facie case.  In
fact, the doctrines of implied license by equitable estoppel and
equitable estoppel are distinct doctrines.  See Wang, 103 F.3d
at 1581.  While the focus of implied license by equitable
estoppel is on whether the patentee affirmatively granted
another the right to use its patents, the doctrine of equitable

47

would not have to pay royalties on Pentax's digital cameras
sales if it acquired Pentax.  Nor does Ricoh claim that Kodak
ever told Ricoh that Pentax had a license to use Kodak patents.
Instead, Ricoh relies principally on the 2002 and 2003
introductory conversations between Kodak and Pentax and their
business ventures that followed.  Ricoh has not presented
evidence that Pentax was prejudiced as a result of its reliance
on any misrepresentations made by Kodak.  Ricoh has not
identified any misrepresentations made or misleading conduct
exhibited to Pentax.  Nor does the record suggest that Pentax
relied on any misrepresentation or misleading conduct in
"commit[ing] any infringing acts or becom[ing] committed to a

---

estoppel focuses on misleading statements or conduct.  <u>Id.</u>  In
addition, the approach taken by Ricoh in its opposition appears
to be influenced by a failure to distinguish between patent law
defenses and elements of a breach of contract claim.  Both
implied license and equitable estoppel are affirmative defenses
to suits for patent infringement.  Accordingly, if Kodak had
sued Pentax for patent infringement, Pentax would have had the
opportunity to prove that it had an implied license through
equitable estoppel or that Kodak should be equitably estopped
from asserting its patents against it.  In the present breach of
contract action, however, the doctrine of implied licenses
became relevant to Kodak's <u>prima facie</u> case as a result of the
PLA's use of the term "licensed."  Accordingly, because Kodak
has the burden to prove that the PLA was breached, the PLA's
inclusion of the term "licensed" requires it to prove that
Pentax was <u>not</u> licensed, either expressly or impliedly.  The PLA
does not, however, similarly incorporate the doctrine of
equitable estoppel into its terms.

course of infringing action."[15]  Stickle, 716 F.2d at 1559
(citation omitted).

Nor does Ricoh claim that Pentax told Ricoh that it had a
license of any kind from Kodak to use Kodak patents.  At most,
the record indicates that Pentax told Ricoh that Pentax had a
good relationship with Kodak.  This was not a misrepresentation,
and even if it were, it would not have been reasonable for Ricoh
to rely on it in failing to pay royalties owed under Section 4.2
of the PLA, since the PLA does not excuse Ricoh from paying
royalties for the sales of an acquired business with which Kodak
has had a "good relationship."  Zumpano v. Quinn, 6 N.Y.3d 666,
674 (2006) (party invoking equitable estoppel "must demonstrate
reasonable reliance." (emphasis supplied)).  Accordingly, Ricoh
has failed to demonstrate that Kodak should be equitably
estoppel from suing Ricoh for breach of the PLA.

C. Laches

Ricoh asserts an affirmative defense of laches, claiming
that the passage of time bars this lawsuit.  This affirmative
defense fails as well.  Under New York law, a claim for breach
of contract is governed by a six-year statute of limitations.

---

[15] Ricoh seems to suggest that Pentax's action taken in reliance
on Kodak's misleading conduct was its participation in the
ImageLink Program and purchase of CCD sensors.  But, Ricoh has
not shown that Pentax suffered any prejudice as a result of
these actions.

N.Y. C.P.L.R. § 213.   Ricoh breached the PLA in 2011 when it acquired Pentax but failed to pay any royalties for Pentax's digital camera sales.   Kodak filed suit on April 19, 2012, well within the six-year statute of limitations.

The doctrine of laches is derived from the equitable principle that "equity aids the vigilant, not those who sleep on their rights."   Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 259 (2d Cir. 1997) (citation and quotation marks omitted).   Laches "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant."   Id. (citation omitted).   The doctrine of laches is not, however, a defense to a claim for damages.   See Oneida County v. Oneida Indian Nation of N.Y. State, 470 U.S. 226, 244 n.16 (1985) (noting that the "application of the equitable defense of laches in an action at law would be novel indeed"); Ivani Contracting Corp., 103 F.3d at 262 (holding that laches would not bar a legal claim under 42 U.S.C. § 1983); Ecumenical Task Force of Niagara Frontier, Inc. v. Love Canal Area Revitalization Agency, 583 N.Y.S.2d 859, 862 (4th Dep't 1992) ("Because laches is a purely equitable defense, it will not serve to bar recovery in an action at law commenced within the limitations period."); Kahn v. N.Y. Times Co., 503 N.Y.S.2d 561, 567 (1st Dep't 1986).   Accordingly, laches does

not bar Kodak's suit to recover damages for Ricoh's breach of the PLA.

CONCLUSION

The plaintiff's May 22, 2013 motion for partial summary judgment is granted in part.  Kodak is entitled to summary judgment on its claim that Ricoh breached the PLA and on Ricoh's affirmative defenses of patent misuse, equitable estoppel, and laches.  Because the record contains insufficient evidence of the manner in which DSLR camera bodies and lenses are sold, Kodak's motion for summary judgment with respect to whether DSLR cameras sold by Pentax fall within the PLA's definition of "Digital Camera" is denied.

Dated:    New York, New York
          August 9, 2013

                              _____
                                        DENISE COTE
                              United States District Judge