UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EASTMAN KODAK COMPANY,

Plaintiff,

v.

RICOH COMPANY, LTD.,

Defendant

Case No. 1:12-cv-03109 (DLC)

**MEMORANDUM OF LAW IN OPPOSITION TO EASTMAN KODAK COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT RICOH COMPANY, LTD. BREACHED THE PARTIES' PATENT LICENSE AGREEMENT**

## **Table of Contents**

I.      INTRODUCTION .................................................................................1

II.     FACTS ...............................................................................................2

III.    ARGUMENT .....................................................................................5

      A.     Summary Judgment Should Be Denied Because There Are Factual
Disputes Regarding the Scope of Paragraph 4.4....................................6

      B.     Summary Judgment Should Be Denied Because There Are Factual
Disputes Regarding Whether Pentax Is a Previously Licensed Business...............9

           1.     The Purportedly Undisputed Facts Cited by Kodak Are Irrelevant
to Ricoh's Implied License Defense .........................................9

           2.     There Is Substantial Evidence that Kodak's Conduct Gave Rise to
an Implied License ....................................................................10

           3.     Kodak Has Not Met Its Burden To Demonstrate that It Is Entitled
to Summary Judgment of No Implied License ...........................13

      C.     Summary Judgment Should Be Denied Because There Are Factual
Disputes Regarding Ricoh's Patent Misuse Defense.............................16

           1.     The Evidence Demonstrates that Kodak Conditioned the Grant of a
License on Ricoh's Acceptance of the Indisputably Overbroad
Royalty Provisions of the PLA .................................................17

           2.     The Mutual Convenience Clause of Paragraph 4.2 Does Not
Trump the Substantial Evidence Showing Patent Misuse ........................19

      D.     Summary Judgment Should Be Denied Because There Are Factual
Disputes Regarding Pentax's DSLR Products.......................................20

           1.     Kodak's Position Is Nonsensical in Light of Kodak's Admissions
that Neither DSLR Bodies Nor Lenses Fall Within the Scope of the
PLA ...........................................................................................20

           2.     Standard Industry Practice Is To Differentiate Between Point-and-
Shoot Cameras and DSLRs Based on the Removability of Lenses
and Portability..........................................................................21

           3.     Kodak Understood that DSLR Products Did Not Fall Within the
Scope of the PLA's Definition of "Digital Cameras"................21

4.      There Are Additional Disputed Issues of Fact Regarding Whether
        Pentax DSLRs Are Portable and Self-Contained....................................22

IV.    CONCLUSION.................................................................................................23

## TABLE OF AUTHORITIES

**Page**

### Cases

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
   960 F.2d 1020 (Fed. Cir. 1992)...................................................................................7, 8, 12

*Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's*,
   136 F.3d 82 (2d Cir. 1998)...................................................................................................8

*Am. Eagle Outfitters, Inc. v. Payless Shoesource, Inc., No. CV 1675*,
   2009 WL 152712 (E.D.N.Y. Jan. 21, 2009) .....................................................................22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................................................................6

*Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*,
   605 F.3d 1305 (Fed. Cir. 2010).........................................................................................11

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997).........................................................................................16

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*,
   750 F.2d 903 (Fed. Cir. 1984)...........................................................................................13

*Bridgeport Music Inc. v. UMG Recordings, Inc.*,
   No. 05 Civ. 6430, 2007 WL 4410405 (S.D.N.Y. Dec. 17, 2007).......................................22

*Duval Sulphur & Potash Co. v. Potash Co.*,
   244 F.2d 698 (10th Cir. 1957) ...........................................................................................13

*Eastman Kodak Co. v. Asia Optical Co.*,
   No. 11-cv-6036, 2012 U.S. Dist. LEXIS 36157 (S.D.N.Y. Mar. 16, 2012).....................16, 19

*Engel Indus., Inc. v. Lockformer Co.*,
   96 F.3d 1398 (Fed. Cir. 1996)...........................................................................................19

*Freescale Semiconductor v. ChipMOS Techs., Inc.*,
   No. 5:09-cv-03689, 2012 U.S. Dist. LEXIS 45525 (N.D. Cal. Mar. 30, 2012) .................18

*Hunt v. Cromartie*,
   526 U.S. 541 (1999).............................................................................................................5

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital*,
   424 F.3d 195 (2d Cir. 2005)....................................................................................8, 22, 23

*Medinol Ltd. v. Boston Sci. Corp.*,
   346 F. Supp. 2d 575 (S.D.N.Y. 2004).................................................................................13

*Newmont Mines Ltd. v. Hanover Ins. Co.*,
   784 F.2d 127 (2d Cir. 1986)...............................................................................................20

*Odetics, Inc. v. Storage Tech. Corp.*,
   185 F.3d 1259 (Fed. Cir. 1999)................................................................................7

*Pentair Water Treatment (OH) Co. v. Continental Ins. Co.*,
   No. 08 Civ. 3604, 2009 WL 3817600 (S.D.N.Y. Nov. 16, 2009) ...........................22

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013).........................................................................16, 17

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
   553 U.S. 617 (2008)................................................................................................7

*Radio Sys. Corp. v. Lalor*,
   709 F.3d 1124 (Fed. Cir. 2013)...............................................................................11

*Stickle v. Heublein, Inc.*,
   716 F.2d 1550 (Fed. Cir. 1983).........................................................................12, 13

*Trilegiant Corp. v. Sitel Corp.*,
   272 F.R.D. 360 (S.D.N.Y. 2010) ..............................................................................22

*Vivid Techs., Inc. v. American Science & Engineering, Inc.*,
   200 F.3d 795 (Fed. Cir. 1999) ................................................................................14

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*,
   103 F.3d 1571 (Fed. Cir. 2007)...........................................................................9, 10

*Well Surveys, Inc. v. Perfo-Log, Inc.*,
   396 F.2d 15 (10th Cir. 1968) ..................................................................................17

*Winbond Elecs. Corp. v. International Trade Comm'n*,
   262 F.3d 1363 (Fed. Cir. 2001)........................................................................9, 10, 11

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969)............................................................................................16, 18

<u>**Statutes**</u>

Fed. R. Civ. P. 30(e) ...................................................................................................14

iv

I.      **INTRODUCTION**

In this case, there is no dispute that Ricoh has paid all royalties owed to Kodak as a result of Ricoh's own digital camera sales.  Nonetheless, Kodak is seeking almost $100 million in royalties from Ricoh for Pentax's purportedly infringing digital camera sales dating back more than a decade and long before Ricoh acquired Pentax.  But Kodak would not have been entitled to receive *any* such royalties from Pentax had it enforced its patents against Pentax.  And nothing about the Patent License Agreement ("PLA") at issue here suddenly entitles Kodak to seek those same royalties from Ricoh now.

Substantial evidence—including the operative provisions of the PLA, admissions by Kodak witnesses, testimony by Ricoh witnesses, and expert testimony regarding non-controversial customs and practices in patent licensing—shows that Ricoh is required to pay royalties on Pentax products only to the extent that, among other things, (i) Kodak could have otherwise recovered such royalties from Pentax and (ii) Pentax was not previously licensed.  But Kodak cannot show that either of these conditions is satisfied here.

Indeed, Kodak knowingly encouraged Pentax to sell digital cameras that Kodak believed to infringe its patents for more than a decade prior to Pentax's acquisition by Ricoh.  As such, the equitable doctrines of laches and estoppel appropriately bar Kodak's belated attempt to recover royalties related to those sales.  Moreover, Pentax's sales were subject to an implied license that arose from years of conduct demonstrating Kodak's and Pentax's joint understanding that, so long as the companies continued their close business alliance to the benefit of Kodak, Pentax would not owe royalties to Kodak.  And as Kodak admits, previously licensed sales by Pentax— for which Kodak already received the compensation it desired—are simply not subject to any royalty obligation under the PLA.

1

What is more, Kodak's breach of contract claim is barred by the doctrine of patent misuse.  This is the unusual case in which there is direct evidence, from Kodak itself, that it conditioned a license grant on Ricoh's acceptance of indisputably overbroad—and thus improper—royalty obligations.  As a result, those obligations are unenforceable here.

All of these myriad issues give rise to numerous factual disputes.  For example, the parties now apparently dispute whether the PLA requires Ricoh to pay royalties on behalf of Pentax that would not otherwise be owed by Pentax.  Kodak itself has taken the position that it does not.  So for Kodak to now seek summary judgment that the PLA does contain such a requirement—contrary to its own position, common sense, and well-established customs and practices in licensing—is nonsensical.  As another example, the existence and scope of an implied license—always a fact-intensive inquiry—must be determined here based on the substantial evidence demonstrating the quid pro quo business alliance that existed between Pentax and Kodak for more than a decade.  Separate and apart from such issues, the direct evidence of Kodak's patent misuse cannot be ignored.  And even if Kodak's claim were ultimately deemed viable after all these factual disputes were resolved, there would remain factual issues regarding which Pentax sales would be subject to any royalty obligation under the PLA.

Thus, even before drawing all inferences in Ricoh's favor (which must be done in the summary judgment context), it is clear that the disputed factual issues here must be resolved by weighing the evidence and assessing credibility.  Accordingly, Kodak's breach of contract claim is not amenable to summary judgment, and Kodak's motion should be denied.

## II.    FACTS

Kodak's Patent Enforcement Campaign.  Kodak began its global patent enforcement campaign in 1999.  (Ricoh's Counter-Statement of Disputed Facts ("RSOF") ¶¶ 116-119.)  The goal of the program was to "[a]ggressively license Kodak patents" for "all digital cameras,

[digital video cameras] and camera phones." (*Id*. ¶ 118.)  Kodak's stated intent was to either license every digital camera company or to use the threat of patent enforcement to drive some other "business partnership" beneficial to Kodak.  (*Id*. ¶ 122.)  By 2004, most of the digital camera industry—except for Pentax—had signed a license agreement with Kodak, was negotiating with Kodak, or was being actively pursued by Kodak. (*Id*. ¶ 120.)  By 2007, Kodak had entered into over 25 licenses relating to its digital camera patent portfolio and was actively litigating against those companies that had not voluntarily signed such a license. (*Id*. ¶ 121.)

    <u>Kodak's Unique Relationship with Pentax.</u>   As Kodak embarked on its patent enforcement campaign, Kodak and Pentax began developing a close business relationship. (*Id*. ¶¶ 81-104.)  In 1999, Pentax began discussing the use of Kodak image sensors in its cameras. (*Id*. ¶ 92.)  Pentax also agreed to participate in Kodak's "ImageLink" program and added hardware to Pentax cameras so that they could be docked onto Kodak printers. (*Id*. ¶¶ 83-90.)  Indeed, Kodak, having experienced setbacks in the Japanese market, viewed ImageLink—and Pentax's participation in that program—as critical to its success. (*Id*. ¶¶ 86-87.)

    Both as a result of these business dealings and as part of Kodak's data-gathering for its patent enforcement campaign, Kodak was intimately familiar with Pentax's digital camera offerings and sales.  As just one example, the manager of Kodak's ImageLink program, who was also involved in Kodak's licensing program, had extensive knowledge of Pentax's digital camera line. (*Id*. ¶¶ 128-129.)  And members of Kodak's licensing team regularly received emails about the release of new Pentax digital cameras. (*Id*. ¶ 127.)

    But although Kodak was clearly aware that Pentax was selling digital cameras—and although Kodak believed all digital cameras infringed its patent portfolio—Kodak's internal presentations affirmatively indicate that Pentax was ***not*** a target of Kodak's enforcement program. (*Id*. ¶¶ 116-118, 130-132.)  Kodak has admitted that it "never accused Pentax of

infringing any Kodak Patents." (*Id.* ¶ 136.)  And for more than a decade, Kodak never once sought royalties from Pentax or requested that Pentax license Kodak's patents. (*Id.* ¶¶ 130-136.) As Kodak's former Vice President and Chief of the Digital Camera Business explained, "Pentax was not a Kodak target at the time because, among other reasons, Pentax had a good business relationship with Kodak." (*Id.* ¶ 131.)

Indeed, Pentax's former President testified that the Kodak-Pentax business alliance was so comprehensive that it "is not conceivable in . . . normal competitive companies." (*Id.* ¶ 104.) Pentax understood that this unusual business alliance included not only Pentax's purchase of Kodak image sensors, Pentax's participation in ImageLink, and other business dealings beneficial to Kodak, but also a tacit agreement that Kodak would not enforce its patents against Pentax and that Pentax would not enforce its patents against Kodak. (*Id.* ¶¶ 110-114.) Contemporaneous documents confirm this understanding. (*Id.* ¶¶ 82, 84, 107.)  As do statements by Kodak "regarding favorable patent treatment in exchange for a business alliance to Pentax." (*Id.* ¶¶ 97, 110, 114.)  Kodak's conduct—for over a decade—thus resulted in an understanding that "the comprehensive digital camera business alliance" between Pentax and Kodak included the freedom for Pentax to sell digital cameras without paying royalties to Kodak. (*Id.* ¶¶ 110, 114.)

The Royalty Provisions of the PLA.  The PLA between Kodak and Ricoh was executed as part of Kodak's patent enforcement program in 2002. (*Id.* ¶ 1.)  Paragraphs 4.2 and 4.4 of the PLA provide that, for products falling within the scope of the agreement, Ricoh must pay royalties on total worldwide sales. (*Id.* ¶¶ 4-5.)  Those provisions were unilaterally imposed on Ricoh as a condition of receiving a license to Kodak's patents and over Ricoh's objection. (*Id.* ¶¶ 41-50.)  As Ricoh explained to Kodak, "[o]ur people are greatly dissatisfied with the unprecedented calculation method of the commuted royalty, [where] royalties are to be paid on world-wide sales without regard to existence of patents." (*Id.* ¶ 41.)  Although Ricoh offered

alternative language that was tailored to actual purportedly infringing conduct and sought a termination provision in the event it withdrew from the U.S. market (the geography in which Kodak held most of its patents), Kodak maintained that the royalty provisions were "not negotiable." (*Id.* ¶¶ 42-45, 49.)  Kodak immediately rejected Ricoh's proposals and presented Ricoh with a "choice"—sign a license and pay royalties on worldwide total sales or be sued:  "If [a ███ commuted, worldwide royalty rate] is not acceptable, you are leaving us with no alternative but to take legal action … THE CHOICE IS YOURS." (*Id.* ¶ 46.)  Refusing to negotiate the worldwide total-sales provision was, in fact, Kodak's corporate policy. (*Id.* ¶¶ 42-45, 47, 141.)

> DSLR Cameras Versus Point-and-Shoot Cameras.  Ricoh never marketed or sold DSLR cameras until it acquired Pentax on October 1, 2011, and DSLR cameras were not a consideration during the PLA negotiations. (*Id.* ¶¶ 59-60.)  DSLR cameras make up a small retail market distinct from the large market for point-and-shoot digital cameras. (*Id.* ¶ 58.)  Consumers recognize that DSLR bodies and interchangeable lenses are not "portable" and often choose point-and-shoot cameras over cumbersome DSLR systems. (*Id.* ¶ 79.)

Pentax DSLR camera bodies are separate, stand-alone products designed to accept a variety of separate, stand-alone interchangeable lenses. (*Id.* ¶¶ 70-73.)  No Pentax DSLR system is sold with an interchangeable lens already attached to a DSLR camera body. (*Id.* ¶ 74.)

## III.   **ARGUMENT**

"[I]n ruling on [Kodak's] motion for summary judgment, [Ricoh]'s evidence 'is to be believed, and all justifiable inferences are to be drawn in [Ricoh's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).  Here, the evidence and justifiable inferences are more than sufficient to show that the resolution of Kodak's breach of contract claim requires "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Ricoh is thus entitled to a trial on that claim, and Kodak's motion for summary judgment should be denied. *Id.*

A.     **Summary Judgment Should Be Denied Because There Are Factual Disputes Regarding the Scope of Paragraph 4.4**

Paragraph 4.4 of the PLA—the subject of Kodak's breach of contract claim—applies only "[i]f Ricoh acquires a business after the Effective Date of this Agreement which business was not previously licensed by Kodak under Kodak's Patents and for which said business had not paid Kodak royalties on Licensed Products sold by said acquired business." (Ex. 1.)[1] In other words, paragraph 4.4 applies only if Kodak could have sought royalties from the acquired business absent its acquisition by Ricoh. This is the only commercially reasonable interpretation of paragraph 4.4, as neither Ricoh nor any other objectively reasonable licensee would agree to pay Kodak royalties on behalf of an acquired business without regard to whether Kodak could recover those same royalties from the acquired business itself. (Silverman[2] ¶¶ 62-84.)

Indeed, Kodak has already conceded that paragraph 4.4 applies only where Kodak could have recovered royalties directly from the acquired business. For example, Kodak's own position is that it cannot recover a royalty from Ricoh on any Pentax products that Pentax purchased from an OEM licensed under Kodak's patents, even though, according to Kodak, Pentax "was not previously licensed by Kodak" and "had not paid Kodak royalties" on those products. (Ex. 14 at 603:14-605:14.) Indeed, Kodak's damages expert excludes digital cameras that Pentax purchased from licensed OEMs from his calculation of the royalty base in this case. (Ex. 148 at 26.) Kodak's position in this regard makes sense: Kodak would be barred from recovering royalties on such products from Pentax as a result of patent exhaustion, *Quanta*

---

[1] "Ex." refers to exhibits to the Declaration of Graham Pechenik, submitted herewith.

[2] "Silverman" refers to the Declaration of Carl Silverman, a licensing professional with over 35 years of experience in patent licensing, submitted herewith. (Silverman ¶¶ 5-18.)

*Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 638 (2008), and thus Kodak is barred from recovering royalties on those products from Ricoh under paragraph 4.4 of the PLA.

The facts show that other doctrines similarly operate to limit the royalties that Kodak can recover here, under the very same rationale already adopted by Kodak in the context of patent exhaustion.  For example, as demonstrated above, by the time Ricoh acquired Pentax in 2011, Kodak had been aware of Pentax's purported infringement for more than a decade but had never sought royalties from Pentax via licensing negotiations or legal action.  (RSOF ¶¶ 116-137.) Kodak's failure to take any such action gives rise to a mandatory presumption that Kodak would be barred from seeking royalties from Pentax due to laches and equitable estoppel.  *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992).  As a result, Kodak would likewise be barred from recovering those royalties from Ricoh under Kodak's own interpretation of paragraph 4.4.[3]

It is thus clear that there are numerous factual issues precluding summary judgment here. As an initial matter, to the extent Kodak is now seeking to interpret the language of paragraph 4.4 to permit the recovery of royalties from Ricoh that could not have otherwise been recovered from Pentax, a jury must determine the proper scope of paragraph 4.4 in light of Kodak's inconsistent positions on the issue, custom and practice, and the common sense of a reasonably intelligent person.  Indeed, summary judgment cannot be granted where a contract provision "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of

---

[3] Contrary to Kodak's assertion (Motion 20-21), Ricoh does not contend that laches bars Kodak's breach of contract claim.  Rather, Kodak's decision to sleep on its patent rights with respect to Pentax products is an implicit "authorization to sell" that now bars Kodak from collecting royalties on those products. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1273 (Fed. Cir. 1999) (finding that patentees would be "encourage[d] to adopt a strategy of ambush rather than providing fair notice" if permitted to recover damages for period of delay).

the customs, practices, usages and terminology as generally understood in the particular trade or business." *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998); *see also LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital*, 424 F.3d 195, 205 (2d Cir. 2005) ("[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.").

Here, the evidence on all the relevant considerations contradicts Kodak's new far-reaching interpretation of paragraph 4.4. For example, the expert evidence is that licensing provisions such as paragraph 4.4 are intended to protect a licensor from losing out on royalties that ***it would have otherwise been entitled to*** simply because a business is acquired. (Silverman Decl., ¶¶ 48, 54, 62-82.) Moreover, if paragraph 4.4 were to be interpreted as Kodak now seems to suggest (and contrary to its own position in other contexts)—*i.e.*, to permit the recovery of royalties that would not otherwise be recoverable from Pentax—the result would be nonsensical. Such an interpretation would, for example, permit Kodak to recover royalties from Ricoh on Pentax products previously adjudicated to be non-infringing.

Moreover, if the jury adopts the proper interpretation of paragraph 4.4, it must also resolve all the factual disputes related to whether Kodak could have sought from Pentax the royalties it now seeks from Ricoh. So, for example, a jury would need to decide whether Kodak had been aware of Pentax's purported infringement since 1999 (RSOF ¶¶ 123-133) and whether Pentax would be prejudiced by Kodak seeking royalties predicated on that purported infringement for the first time after more than a decade (RSOF ¶¶ 144-147), such that Kodak would be barred from seeking any royalties predicated on that purported infringement. *A.C. Aukerman*, 960 F.2d at 1033, 1043.

For these reasons alone, Kodak's motion should be denied.

**B.      Summary Judgment Should Be Denied Because There Are Factual Disputes Regarding Whether Pentax Is a Previously Licensed Business**

Even assuming that Pentax sales would otherwise fall within the scope of paragraph 4.4 of the PLA, the payment obligations set out in that paragraph are not triggered unless Pentax "was not previously licensed by Kodak under Kodak's Patents."  (Ex. 1.)  Kodak argues that Pentax meets this requirement because there is no evidence of an ***express license agreement*** between Pentax and Kodak.  (*E.g.*, Motion 7.)  And it is on that basis that Kodak contends it is entitled to summary judgment on Ricoh's implied license defense.

But Kodak's contention is based on a fundamental misunderstanding of Ricoh's defense. It is ***Kodak's conduct*** with respect to Pentax—including Kodak's decision ***not*** to accuse Pentax of infringement for more than ***ten years*** despite its intimate knowledge of Pentax's activities and despite its deliberate campaign to assert infringement against every other player in the digital camera industry (RSOF ¶¶ 136-137)—that gave rise to an ***implied*** license to Kodak's patents. Indeed, Kodak opted to be compensated for this implied license through the benefits it received from its unique business alliance with Pentax rather than through royalty payments.  (*Id.* ¶ 17.) All of this evidence—ignored in Kodak's motion—is more than sufficient to demonstrate that there is a triable issue of fact regarding Ricoh's implied license defense.

1.      The Purportedly Undisputed Facts Cited by Kodak Are Irrelevant to Ricoh's Implied License Defense

By definition, no express agreement (written or oral) is required to establish an implied license.  *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1582 (Fed. Cir. 2007). There is no requirement that the parties agree on any specific terms.  *Winbond Elecs. Corp. v. International Trade Comm'n*, 262 F.3d 1363, 1374 (Fed. Cir. 2001).  Indeed, there need be no communication between the parties at all.  *Id.*

And this makes sense, because implied licenses arise by operation of law *in the absence of an express license*.  *Id.*  It is the conduct (or lack thereof) of the implied licensor and the interpretation of that conduct by the licensee that are key to the judicial determination of whether an implied license exists.  *Id.*  So, for example, an implied license may result "by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel."  *Wang Labs*, 103 F.3d at 1580.  "These labels describe not different *kinds of licenses*, but rather different *categories of conduct* which lead to the same conclusion: an implied license."  *Id.* (emphasis added).

In almost all respects, Kodak's motion for summary judgment appears to mistake Ricoh's *implied* license defense for an *express* license defense.  For example, Kodak contends that the following purportedly undisputed facts support its motion: Pentax and Kodak never signed a written patent license agreement; they never negotiated the terms of a license (including which Kodak patents would be included and what the royalty rate would be); Kodak never explicitly told Pentax that it was licensed; and Pentax did not know whether certain individuals at Kodak had authority to grant Pentax a license.  (Motion 7-8, 12-14.)  These "facts"—if assumed true— would show only that Ricoh could not establish an *express* license defense in this case.  But, of course, the absence of an express license is a necessary prerequisite for the defense that Ricoh has actually asserted—an *implied* license defense.  Thus, Kodak's citation to evidence regarding the lack of an *express* license cannot assist Kodak in meeting its burden to show that there are no disputed facts regarding Ricoh's *implied* license defense.

2.    There Is Substantial Evidence that Kodak's Conduct Gave Rise to an Implied License

In *Winbond* the Federal Circuit set out the requirements for finding "an implied license by equitable estoppel."  262 F.3d at 1374.  Such a finding requires proof that the patentee's conduct demonstrated consent to infringement, that the alleged infringer could reasonably infer

consent, and that the alleged infringer would be materially prejudiced if the patentee were allowed to proceed with its infringement claim. *Id.* Here, there are disputed issues of material fact on each of these points.

First, a reasonable jury could certainly find that Kodak's conduct implied consent to Pentax's purported infringement of Kodak's patents. Kodak began its comprehensive patent enforcement program—asserting its position that all digital cameras infringe Kodak's patents—in 1999. (RSOF ¶¶ 116-121.) By 2007, Kodak had asserted its patent portfolio against virtually each and every supplier in the digital camera industry, including companies generating significantly lower revenues than Pentax with less well-known brands. (*Id.* ¶ 121.) But although Kodak became aware of Pentax's role in the digital camera business as early as 1999, Kodak ***never*** so much as suggested that Pentax should take a license to its patents. (*Id.* ¶ 137.) Instead, Kodak left Pentax as essentially the sole digital camera supplier from which Kodak did not demand a license. Indeed, Kodak ***never*** sought royalties from Pentax from the time Kodak began its licensing campaign (1999) through the time of Pentax's acquisition by Ricoh (October 2011). (*Id.* ¶137.) Kodak's years of informed silence—*i.e.*, acquiescence—are sufficient to support a finding that an implied license arose via equitable estoppel. *E.g.*, *Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130-31 (Fed. Cir. 2013) (affirming dismissal of infringement action based on equitable estoppel after 4.5 years of silence); *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1308, 1314 (Fed. Cir. 2010) (affirming dismissal of infringement action based on equitable estoppel after 3 years of silence).

Second, there is substantial evidence that both Kodak and Pentax understood Kodak's course of conduct to indicate consent to any purported infringement. Indeed, Kodak repeatedly and explicitly cited the fact that it had ***refrained*** from asserting its digital camera patents against Pentax as a reason that Pentax should be willing to engage in business dealings—involving, for

11

example, the ImageLink consortium and the purchase of sensors from Kodak[4]—that were "important to Kodak." (RSOF ¶¶ 14,18, 111.) For Pentax, however, these deals made business sense only in light of a continued "alliance" between Kodak and Pentax, which was later solidified by the companies' top executives and exemplified by Kodak's abstention from making Pentax a target of its patent enforcement program. (*E.g.*, Ex. 10 at 66:9-17; Ex. 24 at 73:21-23; Ex. 23 at 60:7-61:2; Ex. 19 at 62:22-63:15, 198:15-19, 213:13-22.)

Third, it is obvious that Pentax would be materially prejudiced by an assertion of infringement in 2012, after Kodak had consciously refrained from making such an assertion for more than a decade. Indeed, a knowing delay of such length typically results in substantial prejudice, as a patent holder is not entitled to "sit on its rights while damages accrue" and while relevant evidence and recollections dissipate over time. *A.C. Aukerman*, 960 F.2d at 1033, 1043. And material prejudice certainly exists here, (i) where Kodak has ***already been compensated*** for any infringement by Pentax, as it received substantial benefits from more than a decade-long corporate alliance that would not have been "conceivable [with] normal competitive companies" (Ex. 24 at 76:18-77:23) and (ii) where the facts reveal substantial evidentiary prejudice (RSOF ¶¶ 144-147).

Thus, the evidence here firmly supports Ricoh's implied license defense. And no case cited by Kodak (Motion 16-17) suggests otherwise. For example, in *Stickle*, the court ruled on an implied license defense only after a trial was held to determine whether the purported licensee

---

[4] Whether the agreements memorializing these deals expressly granted Pentax rights to Kodak's patents (Motion 15-16) is inapposite. It was the parties' course of conduct as a whole that gave rise to Pentax's implied license. Indeed, it would not have made sense to memorialize any license on set terms at the early stages of the business relationship (when, for example, the ImageLink deal was executed)—at that point, the freedom of each party to operate without seeking royalties from the other was contingent on the parties demonstrating a continuing commitment to the nascent business alliance. (*E.g.*, Ex. 24 at 44:14–55:12-16.)

"could properly infer that it had consent" from the "entire *course of conduct*" at issue. *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1559 (Fed. Cir. 1983) (emphasis added) (noting that an implied license may arise from "any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent"). And in *Bandag*, the patentee's conduct was unknown to the purported licensee, meaning there was no possible basis for reliance. *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 925-26 (Fed. Cir. 1984).[5] These cases cited by Kodak only underscore that both the patentee's entire course of conduct and the purported licensee's understanding of that conduct must be considered in determining the viability of an implied license defense. And the necessity of such a fact-intensive inquiry renders summary judgment inappropriate here.

 3.   <u>Kodak Has Not Met Its Burden To Demonstrate that It Is Entitled to Summary Judgment of No Implied License</u>

As noted above, Kodak's only commentary regarding the longstanding business relationship between Kodak and Pentax and Kodak's related acquiescence in any patent infringement by Pentax focuses on testimony and evidence indicating that Kodak's conduct did not give rise to an ***express*** license. But citation to such testimony and evidence is insufficient for Kodak to meet its burden on summary judgment with respect to Ricoh's implied license defense.

For example, Kodak asserts that Ricoh seeks to support its implied license defense by "attempt[ing] to substantively alter" deposition testimony through errata sheets "under the guise

---

[5] None of the other cases cited by Kodak remotely suggests that summary judgment of no implied license is appropriate in light of the evidence of record in this case. In *Duval*, the infringer had explicitly rejected an express license with the same terms as the purported implied license. *Duval Sulphur & Potash Co. v. Potash Co.*, 244 F.2d 698, 702 (10th Cir. 1957). Similarly, in *Medinol*, the court found no implied license to "permit the construction of a fourth manufacturing line *sub silento*" where the parties' agreement "articulate[d] with such precision the requirements of the two primary manufacturing lines and of the Alternative Line." *Medinol Ltd. v. Boston Sci. Corp.*, 346 F. Supp. 2d 575, 598 (S.D.N.Y. 2004).

of mistranslation." (Motion 8 n.4.) Specifically, Kodak contends that "Ricoh has attempted to add the word 'written' to its witnesses' repeated admissions that there was 'no agreement' between Kodak and Pentax in order to suggest that there was only no written license between Kodak and Pentax." (*Id.*) But Kodak's argument in this respect is misplaced. As an initial matter, the clarifications made to the cited testimony were necessary and appropriate in light of a legitimate translation issue raised contemporaneously with the testimony. (Pechenik Decl. ¶¶ 149-52; Exs. 149-52.) And perhaps more importantly here, even the original (pre-clarification) translation of the testimony would not weigh in favor of granting Kodak's motion. That testimony—as originally translated—would indicate at most that Pentax did not enter into an ***express*** agreement to license Kodak's patents. (*E.g.*, Ex. 24 at 29-23:39:8.) No Pentax or Ricoh deponent ever testified that Kodak's decade-long course of conduct did not give rise to an ***implied*** license.[6]

As another example, Kodak repeatedly cites a single witness' testimony that Pentax had "no licensing relationship whatsoever with Kodak." (Motion 14-15.) That witness, however, unequivocally testified that, as a result of the relationship between Kodak and Pentax, he understood that "Kodak would not request payment for royalties to Pentax." (Ex. 19 at 62:22-63:15; *id.* at 213:13-22 ("I believed at the time that we didn't have to pay any royalties or patent fees.").) Thus, the only ***accurate*** characterization of the testimony is that, although there was no

---

[6] Kodak's citation to cases holding that a party may not defeat summary judgment "by submitting an affidavit" from a witness "disputing his own prior sworn testimony" (Motion 8 n.4) is unavailing. A deposition errata from a witness is not an affidavit "disputing his own testimony"—an errata ***constitutes*** the witness' sworn deposition testimony. FED. R. CIV. P. 30(e). And if Kodak truly believed that any of Pentax's sworn deposition errata were inaccurate reflections of actual testimony, Kodak should have submitted a declaration to that effect from a certified interpreter with access to the original videotaped depositions. Without such evidence, not only are Kodak's accusations wrong, but there is no basis for them to be considered by the Court. *Vivid Techs., Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 812 (Fed. Cir. 1999) ("The truth of a disputed material fact can not be established on attorney statement alone.").

express license agreement between Pentax and Kodak, Pentax understood that it would not be a target of Kodak's patent enforcement program or otherwise be required to pay Kodak royalties.

Kodak also argues that "when Pentax listed the entities with whom it had license agreements during the acquisition, it excluded Kodak." (Motion 8.)  The undisputed testimony, however, is that Pentax understood that the "list" to which Kodak refers (and from which Kodak was excluded) was to include only *formal, written* license agreements.  (Ex. 13 at 73:4-12; Ex. 19 at 131:19-132:16.)  Moreover, although numerous deponents testified that Pentax informed Ricoh that Pentax did not have an express license agreement with Kodak, those same deponents also testified that Pentax was "*very aggressive* [active] in saying that they had a good business relationship with Kodak." (Ex. 19 at 131:19-132:16; Ex. 7 at 81:17-24; Ex. 13 at 73:4-12, 80:22-81:14, 98:13-22.)  So, again, the evidence cited by Kodak reveals only that there was no *express* license agreement—an issue that is essentially irrelevant to Kodak's motion.

Further, Kodak contends that Pentax could not have believed that it had an implied license because "Pentax had been 'afraid' that Kodak would sue Pentax for infringing Kodak's digital camera patents." (Motion 9.)  But that fear was *exactly why* Pentax continuously worked to maintain an unusually close business alliance with Kodak (forged by the highest ranking executives of each company)—so that Kodak would *not* sue Pentax.  (Ex. 19 at 78:23-79:6.) And the undisputed fact is that Kodak considered its alliance with Pentax sufficiently valuable that it *never did* sue Pentax.  (RSOF ¶ 137.)

In short, Kodak cites no undisputed facts to suggest that summary judgment should be granted on Ricoh's implied license defense and thus has not met even its initial burden under Rule 56.  Ricoh, on the other hand, has demonstrated multiple issues of fact—regarding the longstanding and close business relationship between Kodak and Pentax, Kodak's exclusion of Pentax from its patent enforcement program, and Kodak's acquiescence in Pentax's purported

infringement—that support its defense that Pentax was licensed and that Pentax sales fall outside the scope of paragraph 4.4 of the PLA.  Accordingly, summary judgment should be denied.

### C.   Summary Judgment Should Be Denied Because There Are Factual Disputes Regarding Ricoh's Patent Misuse Defense

The Supreme Court has affirmed that "conditioning the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent does amount to patent misuse."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135 (1969). Patent misuse is a "fact intensive doctrine," and here, substantial factual issues exist regarding whether Kodak's conduct amounts to patent misuse.  *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997).

As an initial matter, Kodak does not dispute that the PLA requires the payment of royalties on products that are not covered by Kodak's patents.  Nor could it.  As just one example, the PLA requires payment of royalties on the total worldwide sales of Ricoh (paragraph 4.2) and the total worldwide sales of acquired businesses (paragraph 4.4), even though Kodak's patents are not worldwide in scope (Ex. 21 57:6-19).  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013) ("It is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad.").

What is more, Kodak ignores the substantial evidence showing that Kodak conditioned the grant of any license to its patents on Ricoh's acceptance of a broad obligation to pay royalties on products falling outside the scope of Kodak's patents.  Indeed, as demonstrated below, and unlike the record in *Eastman Kodak Co. v. Asia Optical Co.*, No. 11-cv-6036, 2012 U.S. Dist. LEXIS 36157 (S.D.N.Y. Mar. 16, 2012), the evidence is unusually compelling on this point.

Instead, Kodak side-steps the direct evidence showing patent misuse and contends that summary judgment is required simply because the PLA recites that one of the two royalty

provisions at issue (paragraph 4.2) was "for the mutual convenience of the parties."  (Motion 19.)
But the mere recitation of that language is not legally determinative of whether the royalty
provision in question resulted from patent misuse or from convenience considerations; it is
simply one fact to be considered.  And that fact must be considered along with the overwhelming
evidence that the *entire* royalty provision of paragraph 4.2—*including* the "mutual convenience"
language—was dictated by Kodak as a condition for granting a patent license.  *E.g.*, *Well
Surveys, Inc. v. Perfo-Log, Inc.*, 396 F.2d 15, 18 (10th Cir. 1968) (denying summary judgment of
no patent misuse because the "fact finder must weigh the provisions of the license agreements
against the facts surrounding the grant of those licenses").

      1.    The Evidence Demonstrates that Kodak Conditioned the Grant of a
               License on Ricoh's Acceptance of the Indisputably Overbroad Royalty
               Provisions of the PLA

Here there is explicit evidence that Kodak imposed royalty payments on Ricoh's (and
acquired businesses') total worldwide sales as a condition for granting Ricoh a license to its
patents.  Ricoh expressed its dissatisfaction with the royalty provisions to Kodak in no uncertain
terms: "Our people are greatly dissatisfied with the unprecedented calculation method of the
commuted royalty, [where] royalties are to be paid on world-wide sales without regard to
existence of patents."  (Ex. 99.)  Ricoh offered alternative language in an effort to match the
royalty obligation more closely to the allegedly infringing sales and also sought to add a
termination provision in the event Ricoh withdrew from the U.S. market (as a majority of
Kodak's patents were U.S. patents that, as a matter of law, may only be infringed by sales in the
United States (RSOF ¶¶ 46-47)).  *See Power Integrations*, 711 F.3d at 1371.

But Kodak's position was that the royalty provision was "not negotiable."  (RSOF ¶ 43.)
So Kodak immediately rejected Ricoh's proposal and presented Ricoh with an ultimatum:

> Please carefully consider the following two alternatives that you have under your control: (1) . . . ██████ commuted, worldwide royalty rate . . . (2) If the first alternative is not acceptable, you are leaving us with no alternative but to take legal action. . . . THE CHOICE IS YOURS.

(*Id.* ¶ 46.)  In other words, Ricoh had to agree to pay Kodak royalties on total worldwide sales or else Kodak would withhold the grant of a license and sue Ricoh.  (Ex. 17 at 147:13-23 ("[D]espite our strong request, Kodak strongly suggested that they would sue us unless we accepted the language as is. So it was inevitable for us to accept it."); *id.* at 103:5-24 ("From the business perspective, [Ricoh] had no other choice at the time but to accept the PLA as proposed by Kodak" because the cost of litigation would "jeopardize the survival of the business unit.").)  Indeed, Kodak made it known that it had sued other companies when they had refused to agree to the same broad royalty provision.  (RSOF ¶¶ 46-48.)

    This is ***direct evidence*** of patent misuse.  *E.g.*, *Zenith*, 395 U.S. at 135 (explaining that patent misuse occurs "where the patentee refuses to license on any other basis [besides total sales] and leaves the licensee with the choice between a license so providing and no license at all"), 139 ("Patent misuse inheres in a patentee's insistence on a percentage-of-sales royalty, regardless of use, and his rejection of licensee proposals to pay only for actual use.").  Such direct evidence precludes granting Kodak's motion for summary judgment.  Indeed, motions for summary judgment of no patent misuse have been denied on a much less compelling record.  *E.g.*, *Freescale Semiconductor v. ChipMOS Techs., Inc*., No. 5:09-cv-03689, 2012 U.S. Dist. LEXIS 45525, at *11-12 (N.D. Cal. Mar. 30, 2012) (denying motion for summary judgment of no patent misuse where there was "evidence of [plaintiff]'s refusal to negotiate ***other*** material terms of its standard agreement" besides the key royalty provision) (emphasis added).

2.      The Mutual Convenience Clause of Paragraph 4.2 Does Not Trump the
        Substantial Evidence Showing Patent Misuse

The recitation of a "mutual convenience" clause in paragraph 4.2 of the PLA[7] does not somehow wipe away the evidence demonstrating patent misuse—it simply adds to the factual dispute.  Critically here, the "mutual convenience" clause was part of the ***very provision*** that Kodak required Ricoh to accept before a patent license would be granted, making the "voluntariness" of Ricoh's agreement to that clause yet another issue of fact that must be decided in the context of Ricoh's patent misuse defense.  *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1408 (Fed. Cir. 1996) ("It is clear from *Zenith Radio* that the voluntariness of the licensee's agreement to the royalty provisions is a key consideration.").  Indeed, it would be nonsensical for a patentee to be able to insulate itself from a charge of patent misuse simply by using its power to require ***both*** an over-reaching royalty provision ***and*** a mutual convenience clause rather than just the former.

Thus, the circumstances here make this case entirely distinguishable from *Asia Optical*, No. 11-cv-6036, 2012 U.S. Dist. LEXIS 36157.  In that case, "[t]here [was] no assertion in either AO's pleadings or its summary judgment opposition papers that AO's agreement to pay a royalty on its total sales was either involuntary or the result of an improper use of market power by Kodak."  *Id.* at *25.  Here, of course, there is substantial evidence supporting just such assertions.  Accordingly, Kodak's motion should be denied.

---

[7] No "mutual convenience" clause appears in paragraph 4.4 of the PLA.  Kodak thus offers ***no*** basis for its motion for summary judgment of no patent misuse with respect to the conditioning of the patent grant for ***acquired businesses*** on the payment of royalties for worldwide sales of those businesses.  Kodak's motion should be denied on that basis alone.

**D. Summary Judgment Should Be Denied Because There Are Factual Disputes Regarding Pentax's DSLR Products**

Finally, Kodak contends that this Court should grant summary judgment that certain of Pentax's DSLR products are "portable, self-contained device[s]" and thus "Digital Cameras" as defined by paragraph 1.2 of the PLA. (Motion 22-23.) But the evidence shows otherwise, and Kodak's motion for summary judgment should be denied on this point as well.

1. <u>Kodak's Position Is Nonsensical in Light of Kodak's Admissions that Neither DSLR Bodies Nor Lenses Fall Within the Scope of the PLA</u>

As an initial matter, Kodak necessarily concedes (i) that Pentax's DSLR bodies are not "Digital Cameras" and (ii) that lenses are not "Digital Cameras." (Motion 7 n.3.) Neither DSLR bodies nor lenses could possibly be considered a "portable, self-contained device" for recording images, as required by paragraph 1.2 of the PLA. (RSOF ¶ 12.) Kodak thus also concedes that it cannot seek damages in this case for (i) sales of DSLR bodies alone or (ii) sales of lenses alone. (Motion 7 n.3.) Indeed, as is typical in the industry, Pentax's DSLR bodies have always been sold separately from its lenses. (RSOF ¶¶ 57, 70-74.) And the parties agree that the PLA does not require a royalty to be paid on those sales. (Motion 7 n.3.)

Nonetheless, Kodak contends that if a customer buys a DSLR body and a lens at the same time, two separate products that are indisputably outside the scope of the PLA are somehow transformed into a single "portable, self-contained device" covered by the PLA. Kodak's position should be rejected as nonsensical on its face. The timing of the sale of DSLR bodies and lenses does not change the nature of those products—if the sale of a DSLR body and a lens to the same customer *at different times* does not fall within the scope of the PLA (as Kodak concedes), the sale of the same products *at the same time* does not fall within the scope of the PLA. *Cf. Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986).

20

      2.      <u>Standard Industry Practice Is To Differentiate Between Point-and-Shoot Cameras and DSLRs Based on the Removability of Lenses and Portability</u>

Point-and-shoot cameras and DSLRs are two distinct segments of the digital camera market catering to distinct categories of customers.  Declaration of Edward R. Fasano ("Fasano") ¶¶ 28-29.) [8]  Point-and-shoot cameras are typified by a single, self-contained body that incorporates, among other components, a non-removable lens; DSLR systems consist of a camera body that can be used with removable, interchangeable lenses.  (*Id.* ¶¶ 30, 35-38.)  In addition, consumers have consistently identified size and lack of portability as a primary dissatisfaction with DSLRs; portability is a primary motivation for purchasing point-and-shoot cameras.  (*Id.* ¶50.)

For these reasons, among others (*see generally id.* ¶¶ 68-75, 90-104), "self-contained" and "portable" are the characteristics most often used in the industry to distinguish point-and-shoot cameras from DSLRs.  (*Id.* ¶¶ 46-53.)  Consequently, from an industry perspective, the definition of "Digital Camera" set forth in the PLA—which is limited to a "portable, self-contained device"—would immediately be understood to exclude DSLRs.  (*Id.* ¶¶ 64-67, 89.) This alone creates a factual issue that precludes the summary judgment sought by Kodak.

      3.      <u>Kodak Understood that DSLR Products Did Not Fall Within the Scope of the PLA's Definition of "Digital Cameras"</u>

Moreover, the evidence shows that—consistent with industry custom and practice—Kodak understood that DSLR products did not fall within the PLA's definition of "Digital Camera."  For example, Kodak entered into a PLA with Nikon that expressly distinguished between (i) a "Digital Still Camera," defined as a "portable, self-contained device" and (ii) a "DSLR Camera," defined as a camera "designed for use with a removable lens."  (Ex. 40)

---

[8] Edward Fasano, a former General Manager of Marketing for Nikon, has over 38 years of experience in the digital camera industry.  (Fasano ¶¶ 4-6.)

Indeed, the definition of "Digital Still Camera" in the Nikon PLA is **exactly the same** as the definition of "Digital Camera" in the Ricoh PLA.  (*Compare id. with* Ex. 1.)  Kodak's addition of a separate and distinct definition for a "DSLR Camera" in the Nikon PLA necessarily means that Kodak understood that DSLRs did **not** fall within the scope of the "Digital Still Camera" definition in the Nikon PLA or the **identical** "Digital Camera" definition in the Ricoh PLA.[9] This conclusion results not only from the application of standard rules of contract interpretation, *Bridgeport Music Inc. v. UMG Recordings, Inc.*, No. 05 Civ. 6430, 2007 WL 4410405, at \*3 (S.D.N.Y. Dec. 17, 2007),[10] but also from Kodak's testimony that the definition of "Digital Camera" should be read as "consistent across all licensees" (Ex. 18 at 257:8-15, 250:4-6).

4.     There Are Additional Disputed Issues of Fact Regarding Whether Pentax DSLRs Are Portable and Self-Contained

Contrary to Kodak's assertions (Motion 23), no Ricoh witness "conceded" that Pentax's DSLR products are either "self-contained" or "portable" as those terms are used in the PLA or in the industry.  To the contrary, the cited testimony only highlights the issues of disputed fact here.

First, whether adding an interchangeable lens to a DSLR body results in "a complete picture taking device" (Motion 23) is irrelevant to whether a DSLR body and lens are "self-contained."  Indeed, the definition of paragraph 1.2 in the PLA imposes **both** requirements—a "Digital Camera" must "capture still or motion images" **and** be "self-contained"—each of which must have a distinct meaning as a matter of contract interpretation.  *E.g.*, *LaSalle*, 424 F.3d at

---

[9] The lack of a separate "DSLR Camera" definition in the Ricoh PLA does not detract from this conclusion.  The Ricoh PLA simply did not cover DSLR products, as Ricoh was not in the DSLR business when the PLA was executed and did not sell any DSLR products until its acquisition of Pentax near the end of the PLA's term.  (Ex. 13; Ex. 17 at 95:1-5.)

[10] *See also Triliegiant Corp. v. Sitel Corp.*, 272 F.R.D. 360, 364 (S.D.N.Y. 2010); *Pentair Water Treatment (OH) Co. v. Continental Ins. Co.*, No. 08 Civ. 3604, 2009 WL 3817600, at \*3 (S.D.N.Y. Nov. 16, 2009); *Am. Eagle Outfitters, Inc. v. Payless Shoesource, Inc.*, No. CV 1675, 2009 WL 152712, at \*3 (E.D.N.Y. Jan. 21, 2009).

206.  Neither a DSLR body nor a lens meets either of those two requirements; when one is added to the other, they meet the first requirement only.  (Ex. 8 at 235:1-4; RSOF ¶¶12, 80.)

Second, Kodak's one-sentence discussion of the "portable" requirement of paragraph 1.2 is misleading and inapposite.  Ricoh's corporate designee on Pentax's digital cameras, Mr. Kawano, did not concede that DSLRs are "portable" as that term is used in the PLA.  Kodak's counsel instructed Mr. Kawano to answer questions regarding whether DSLRs are "portable" by assuming that "portable" means "you can carry it with you."  (Ex. 8 at 28:16-17, 22-23.)  But the evidence shows that such a definition of "portable" is contrary to how the term is understood in the industry and to how Ricoh understands the term.  (*E.g.*, Fasano at ¶¶ 64-67; Ex. 5 at 21:18-22:4.)  Mr. Kawano acknowledged this and explicitly qualified his testimony—stating that a DSLR could be considered "portable" *only* "if by 'portable' you mean "carrying around with a strap or carrying it around in a bag."  (Ex. 8 at 28:24-29:13.)

Thus, the evidence demonstrates that, at the very least, there are disputed issues of fact as to whether DSLRs fall within the definition of "Digital Cameras" set forth in the PLA.  Those disputed issues require that Kodak's motion for summary judgment be denied.

## IV.   CONCLUSION

For all of the reasons stated above, Ricoh respectfully requests that Kodak's motion for partial summary judgment that Ricoh breached the parties' patent license agreement be denied.

Dated:  July 12, 2013                    Respectfully submitted,


                                         _/s/_____

                                         David Eiseman*
                                         Philip C. Sternhell
                                         Quinn Emanuel Urquhart & Sullivan LLP
                                         1299 Pennsylvania Ave. NW, Suite 825
                                         Washington, DC 20004
                                         (202)-538-8178
                                         davideiseman@quinnemanuel.com
                                         philipsternhell@quinnemanuel.com

                                         Ryan S. Goldstein*
                                         Quinn Emanuel Urquhart & Sullivan LLP
                                         865 S. Figueroa St., 10th Floor
                                         Los Angeles, CA 90017
                                         (213)-443-3000
                                         ryangoldstein@quinnemanuel.com

                                         Melissa J. Baily
                                         Quinn Emanuel Urquhart & Sullivan LLP
                                         50 California Street, 22nd Floor
                                         San Francisco, CA 94111
                                         (415)-875-6600
                                         melissabaily@quinnemanuel.com

                                         *Admitted pro hac vice

                                         Counsel for Defendant Ricoh Company, Ltd.