# EXHIBIT 1

EASTMAN KODAK COMPANY

CONFIDENTIAL INFORMATION

CONTROLLED DISTRIBUTION

RECLASSIFY _____

# AGREEMENT

This Agreement is made as of the 1st day of May, 2002 by and between:

> Eastman Kodak Company, a New Jersey corporation, having its principal office at 343 State Street, Rochester, New York 14650 (hereinafter "Kodak"); and

> Ricoh Company, Ltd., a Japanese corporation, having its principal office at No. 15-5, Minami, Aoyama 1-chome, Minato-ku, Tokyo 107-8544 Japan (hereinafter "Ricoh").

**WITNESSETH THAT:**

**WHEREAS,** Kodak has acquired and will acquire during the term of the Agreement patents relating to Digital Cameras as defined herein; and

**WHEREAS,** Ricoh has acquired and will acquire during the term of the Agreement patents relating to Digital Cameras as defined herein; and

**WHEREAS,** Ricoh wishes to manufacture, have manufactured and sell Digital Cameras and for that purpose has requested non-exclusive licenses under Kodak's Digital Camera patents; and

**WHEREAS,** Kodak wishes to manufacture, have manufactured and sell Digital Cameras and for that purpose has requested non-exclusive licenses under Ricoh's Digital Camera patents; and

**WHEREAS,** Kodak and Ricoh each represents that it is fully authorized to deal generally with and to make this Agreement respecting the subject matter hereof and the parties desire to enter into this Agreement on the terms hereinafter set forth.

**NOW THEREFORE,** Kodak and Ricoh agree as follows:

dih710:4/24/02

Confidential

KOD-RIC005751

PTX 1

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION

## ARTICLE I

## DEFINITIONS

1.1   "Area Image Sensor" shall mean any integrated circuit having a two-dimensional array of picture elements (pixels) used to detect image patterns of radiant energy.

1.2   "Digital Camera" shall mean a portable, self-contained device utilizing an Area Image Sensor having at least 300,000 pixels, as well as electronics and optical elements that captures still or motion images of visible radiation and (a) records a digital signal representing such images on a Removable Digital Storage Media or (b) stores at least two such images in internal memory.

1.3   "Effective Date" shall be May 1, 2002.

1.4   "Excluded Product" shall mean any Photographic Film Camera, Industrial Camera, Media Product, Motion Analysis Camera or any component thereof installed in an Excluded Product.

1.5   "Excluded Subassembly" shall mean any Movable Flash Unit.

1.6   "Industrial Camera" shall mean a device which (1) is externally powered and rigidly mounted during use; (2) is housed in an industrial strength enclosure with no viewfinder or an attached electronic equivalent; (3) utilizes an Area Image Sensor, as well as drive electronics; and (4) captures and immediately outputs digital images via a cable interface.

1.7   "Kodak Patents" shall mean all classes or types of patents and utility models except design patents and design registrations (including, without limitation, originals, divisions, continuations, continuations-in-part or reissues) and applications having a first effective filing date before the end of the Term (as hereinafter defined) for these classes or types of patent rights in all countries of the world which are owned or licensable by Kodak or its Subsidiaries during the term of this Agreement, and with respect to which Kodak or its Subsidiaries has the right to grant, without approval, a license within and of the scope set forth herein and without the requirement to pay consideration to any third party (other than employees of Kodak or its Subsidiaries) for the grant of a license under this Agreement. Kodak Patents include, but are not limited to U.S. Patents 4,285,588; 5,016,107; 5,164,831; 5,493,335 and 5,382,976 and any foreign counterparts, divisionals and reissues thereof.

2

dih710: 4/24/02

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY _____

1.8     "Licensed Product" shall mean (i) Digital Camera(s), but excluding any Excluded Product, the Excluded Subassembly portion of the Digital Camera notwithstanding the integration or incorporation of the same into the Digital Camera and (ii) for repair or replacement purposes only components of a Digital Camera but excluding any Excluded Subassembly contained in the components.

1.9     "Media Product" shall mean (a) any silver halide media or electrographically sensitized goods or thermally activated goods, and (b) any inks, dyes, chemicals or other marking or image receiving materials for recording a visual image or data on a hard copy media.

1.10    "Motion Analysis Camera" shall mean a device which (1) utilizes an Area Image Sensor, as well as drive electronics, (2) captures motion images of radiant energy at a minimum of 100 images per second and (3) is primarily designed to analyze the motion of manufacturing processes or of products under test.

1.11    "Movable Flash Unit" shall mean a light emitting device attached to a Digital Camera that is movable with respect to the camera body or housing between a storage position in which the light emitting device covers at least a portion of the external camera body or housing and a flash use position in which the light emitting device is extended from the camera body or housing, but does not include devices which are stored internally within the camera body and "pop-up" to the flash use position.

1.12    "Net Sales" in this Agreement shall be determined based on whether a Digital Camera enters the consumer market as a Ricoh Branded Licensed Product or an OEM Licensed Product as defined below.

Ricoh Branded Licensed Product

In the case of an arms length sale or other disposal of a Ricoh Branded Licensed Product, Net Sales shall mean the total net revenue received by Ricoh resulting from the sale or placement of such Ricoh Branded Licensed Product whether through purchase, lease or other commercial transactions to a Ricoh Subsidiary or a non-affiliated third party, less the following Deductions: (i) quantity discounts actually allowed and taken in such amounts as are customary in the trade (to the extent they are not already reflected in the amount received); (ii) invoiced amounts for sales tax, excise taxes, and duties paid, absorbed or allowed, (iii) invoiced amounts billed to cover transportation costs, (iv) amounts repaid or credited by reason of rejection, defects, or returns, and (v) insurance fees.

3

dih710: 4/24/02

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY

In the case of a sale or disposal of a Ricoh Branded Licensed Product which has not been sold in an arms length transaction to a Ricoh Subsidiary or a non-affiliated third party, the Net Sales shall mean the comparable arms-length price to a non-affiliated third party for such Ricoh Branded Licensed Product on or about the date when such sale occurred less any Deductions or, alternatively, if there is no such price, an imputed price determined on a commercially reasonable basis to be no less than the price of commercially available Digital Cameras which are in respect of features and functions equal or substantially equivalent to Ricoh's Branded Licensed Product.

OEM Licensed Product

In the case of an arms length sale or other disposal of a OEM Licensed Product, and which is made with (a) Ricoh's components and/or (b) third party components purchased in an arms length sale, Net Sales shall mean the total net revenue received by Ricoh and its Subsidiaries resulting from the sale or placement of such OEM Licensed Product whether through purchase, lease or other commercial transactions to Ricoh's or Ricoh's Subsidiaries' OEM customers, less any Deductions. Components purchased or acquired by Ricoh or a Subsidiary from an OEM customer for use in manufacturing an OEM Licensed Product for said customer shall be valued for the purpose of royalty determination, at a price equivalent to an arms length transaction purchased from such OEM customer.

In the case of a sale or disposal of an OEM Licensed Product which has not been sold in an arms length transaction, the Net Sales shall mean the comparable arms-length price for such OEM Licensed Product in the country of sale on the date when such sale occurred less any Deductions or, alternatively, if there is no such price, an imputed price determined on a commercially reasonable basis to be no less than the price of commercially available Digital Cameras in the country of sale which are in respect of features and functions equal or substantially equivalent to Ricoh's OEM Licensed Product.

1.13   "OEM Licensed Product" shall mean Licensed Product sold or otherwise disposed of under a tradename or trademark that is owned by a third party

1.14   "Optical Recording/Reproducing Device" shall mean any recording/reproducing apparatus or media that uses the method of optical recording/reproducing by using an optical beam to record information or that of optothermal magnetic recording/reproducing, wherein a magnetic layer is heated with an optical beam to dissipate its magnetization and then recorded by applying a magnetic field.

4

dih710: 4/24/02

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY _____

1.15   "Photographic Film Camera" shall mean any device that captures images of visible radiation on silver halide media.

1.16   "Removable Digital Storage Media" shall mean a readily removable device used to store digital data including, but not limited to, solid-state memory cards, such as Flash Memory cards, magnetic hard drives, magnetic floppy disks, Optical Recording/Reproducing Devices including magneto-optical recording devices, magnetic tape and optical disks.

1.17   "Ricoh Branded Licensed Product" shall mean Licensed Product sold or otherwise disposed of under a tradename or trademark owned by Ricoh or its Subsidiaries.

1.18   "Ricoh Patents" shall mean all classes or types of patents and utility models except design patents and design registrations (including, without limitation, originals, divisions, continuations, continuations-in-part or reissues) and applications having a first effective filing date before the end of the Term (as hereinafter defined) for these classes or types of patent rights in all countries of the world which are owned or licensable by Ricoh or its Subsidiaries during the term of this Agreement, and with respect to which Ricoh or its Subsidiaries has the right to grant, without approval, a license within and of the scope set forth herein and without the requirement to pay consideration to any third party (other than employees of Ricoh or its Subsidiaries) for the grant of a license under this Agreement. Ricoh Patents include, but are not limited to Japanese Patents 2,702,474; 2,918,613; and U.S. Patents 4,779,964 and 6,111,604; and any foreign counterparts, divisionals, and reissues thereof.

1.19   "Subsidiary" shall mean any corporation, partnership or other entity with regard to which (a) more than fifty percent (50%) of the outstanding shares or securities entitled to vote for the election of directors or similar managing authority is directly or indirectly owned or controlled by a party hereto, or (b) which does not have outstanding shares or securities but more than fifty percent (50%) of whose ownership interest representing the right to make decisions for such entity is, now or hereafter, owned or controlled, directly or indirectly, by a party hereto; provided, however, that in each case such corporation, partnership or other entity shall be deemed a Subsidiary only so long as such ownership or control exists and exceeds fifty percent (50%).

dih710: 4/24/02

Confidential

KOD-RIC005755

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY _____

## ARTICLE II

## RELEASE

Subject to payment in accordance with Paragraph 4.1, Kodak on behalf of itself and its Subsidiaries hereby releases, acquits and forever discharges Ricoh, its Subsidiaries which are Subsidiaries as of the Effective Date of this Agreement, and its distributors and customers, direct and indirect, from any and all claims or liability for infringement of any Kodak Patents which arose prior to the Effective Date of this Agreement, to the extent such infringement would have been licensed under the license granted to Ricoh hereunder if such license had been in existence at the time of such infringing activity.

Ricoh on behalf of itself and its Subsidiaries hereby releases, acquits and forever discharges Kodak, its Subsidiaries which are Subsidiaries as of the Effective Date of this Agreement, and its distributors and customers, direct and indirect, from any and all claims or liability for infringement of any Ricoh Patents which arose prior to the Effective Date of this Agreement, to the extent such infringement would have been licensed under the license granted to Kodak hereunder if such license had been in existence at the time of such infringing activity.

## ARTICLE III

## LICENSE GRANT/NON ASSERTION

3.1   (a)   Subject to the obligation of Ricoh to make the payment as specified in Article 4 hereof, Kodak, on behalf of itself and its Subsidiaries, hereby grants and agrees to grant to Ricoh and its Subsidiaries, as of the Effective Date of the Agreement, a non-exclusive, non-transferable license, without the right to sublicense, to make and Have Made (as hereinafter defined) Ricoh Branded Licensed Products and OEM Licensed Products, and to practice any method or process involved in the manufacture, testing or use thereof, under Kodak Patents.

(b)   Subject to the obligation of Ricoh to make the payment as specified in Article 4 hereof, Kodak, on behalf of itself and its Subsidiaries, hereby grants and agrees to grant to Ricoh and its Subsidiaries, as of the Effective Date of the Agreement, a non-exclusive, non-transferable license, without the right to sublicense, to use, lease, sell, import and other-wise dispose of Ricoh Branded Licensed Products and OEM Licensed Products manufactured under the license of Paragraph 3.1(a) under Kodak Patents.

6

dih710: 4/24/02

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY _____

(c)   In the event approval of a third party is required to grant a license under relevant patents owned or licensable by Kodak or its Subsidiaries during the term of this Agreement, Kodak and its Subsidiaries shall not assert such patent against Ricoh and its Subsidiaries.

3.2   (a)   Ricoh, on behalf of itself and its Subsidiaries, hereby grants and agrees to grant to Kodak and its Subsidiaries, as of the Effective Date of the Agreement, a non-exclusive, non-transferable license, without the right to sublicense, to make and Have Made (as hereinafter defined) Licensed Products, and to practice any method or process involved in the manufacture, testing or use thereof, under Ricoh Patents.

(b)   Ricoh, on behalf of itself and its Subsidiaries, hereby grants and agrees to grant to Kodak and its Subsidiaries, as of the Effective Date of the Agreement, a non-exclusive, non-transferable license, without the right to sublicense, to use, lease, sell, import and otherwise dispose of Licensed Products manufactured under the license of Paragraph 3.2(a) under Ricoh Patents.

(c)   In the event approval of a third party is required to grant a license under relevant patents owned or licensable by Ricoh or its Subsidiaries during the term of this Agreement, Ricoh and its Subsidiaries shall not assert such patents against Kodak and its Subsidiaries.

3.3   Nothing herein shall be construed as preventing or restricting either party from manufacturing, using and selling any product in any country or territory, it being understood, however, that no rights under the other party's Patents are granted herein, expressly or by implication, except as specifically provided in Paragraphs 3.1 and 3.2.

3.4   Neither party makes any warranty that the manufacture, use or sale of Licensed Products by the other party and/or its Subsidiaries, will not infringe patents or other intellectual property rights of third parties.

3.5   Neither party makes any representation nor assumes any responsibility or obligation regarding the scope, validity, or enforcement of any of their respective Patents and the amount of any compensation previously paid by and to be paid by Ricoh shall not be affected thereby.

3.6   A license to "Have Made" shall mean a license granted to a party to subcontract the manufacture or assembly of such party's Licensed Product to a third party manufacturer, for the sole account of and for use or resale by

7

dih710: 4/24/02

KOD-RIC005757

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY

the party.  Notwithstanding the above, the license granted herein to a party under the "Have Made" license shall not extend to the sale by the third party manufacturer of a product to another third party regardless of the origin of the product design or manufacture or assembly of a complete product, or portions thereof, which product is sold by the third party manufacturer to a third party.

3.7     To the extent either party manufactures components or manufacturers sub-portions of its Licensed Products for sale to third parties for purposes other than repair or replacement of the same components or sub-portions in a party's Licensed Products, such components and manufactured subportions of its Licensed Products shall not be licensed under this Agreement.

3.8     Ricoh agrees that it will be legally and financially responsible, including the payment of royalties pursuant to Article IV, for all Ricoh Branded Licensed Products and OEM Licensed Products licensed hereunder regardless of the manufacturer or assembler for the same.

## ARTICLE IV

### INITIAL PAYMENT AND ROYALTIES

4.1     Within thirty (30) days after execution of this Agreement by both parties Ricoh shall remit to Kodak a non-returnable payment of two million U.S. Dollars ($2,000,000) as liquidated damages for the sale of Ricoh Branded Licensed Product and OEM Licensed Product from May 19, 1999 through April 30, 2002.   This payment shall be non-creditable against royalties accruing under 4.2 hereof.

4.2     Ricoh and Kodak mutually acknowledge that Kodak has acquired and will acquire numerous Kodak Patents during the term of the Agreement; that Ricoh currently sells and/or plans to sell a variety of models of Ricoh Branded Licensed Product and OEM Licensed Products during the term of the Agreement; and as a result of the foregoing the administrative burden and cost of determining what constitutes a Ricoh Branded Licensed Product and OEM Licensed Product would be great.   Accordingly, for the mutual convenience of the parties, it is agreed that Ricoh shall pay to Kodak a commuted royalty of Two and One-Half percent (2.5%) of the worldwide Net Sales of all Ricoh Branded Licensed Products.  It is further agreed that Ricoh shall pay to Kodak a commuted royalty of three percent (3%) of the worldwide Net Sales of all OEM Licensed Products.

8

dih710: 4/24/02

Confidential

KOD-RIC005758

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY

4.3   For the purpose of this Agreement, Ricoh ~~Licensed Products shall~~ be considered sold when first placed in commercial use by Ricoh or any of its Subsidiaries, such as when billed out, delivered to the trade or exported.

4.4   If Ricoh acquires a business after the Effective Date of this Agreement which business was not previously licensed by Kodak under Kodak's Patents and for which said business had not paid Kodak royalties on Licensed Products sold by said acquired business, then Ricoh shall, with its next royalty payment following the acquisition, remit to Kodak a payment equal to two and one-half percent (2.5%) multiplied by the worldwide Net Sales for the acquired business' Licensed Products for the period beginning on the Effective Date and ending on the acquisition date in addition to paying the royalty due under Paragraph 4.2 for sales by such acquired business after the acquisition date.

4.5   In the event that any amount payable under this Agreement is not paid by the date payment is due, Ricoh shall also pay interest on such amount at a per annum rate equal to two (2) percent plus the prime rate as reported in The Wall Street Journal on the date payment was due for the period from the due date to the date on which payment is actually made, except that such date payment is due may be extended for a maximum of fifteen (15) days if Kodak and Ricoh both agree in writing that the delay was unforeseeable and unavoidable.

4.6   This Agreement is intended to capture the internal transaction business model of Ricoh as it exists on the Effective Date of this Agreement, wherein all Digital Cameras manufactured by Ricoh or a Ricoh Subsidiary or an OEM manufacturer for Ricoh are sold to Ricoh in Japan before such Digital Cameras are sold or otherwise disposed of to any third party or retail Subsidiary in any part of the world.

4.7   Ricoh warranties that all Digital Cameras sold or disposed of by Ricoh or its Subsidiaries before or during the term of this Agreement were or will be sold through Ricoh in Japan, including but not limited to Digital Cameras made by Ricoh manufacturing Subsidiaries outside Japan.

4.8   It is understood that under this Agreement a sale or transfer of a Digital Camera from Ricoh to a Ricoh Subsidiary may be an arms length transaction. Therefore, Ricoh warranties that all Digital Cameras that were or will be, for the term of this Agreement, sold or otherwise disposed of to Subsidiaries were or will be invoiced at prices substantially equal to the price of commercially available Digital Cameras sold to third parties in an arms length transaction which are in respect of features and functions equivalent.

9

dih710: 4/24/02

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY _____

4.9    It is intended that under this Agreement Ricoh shall pay a royalty on all Digital Cameras sold or transferred by Ricoh or a Ricoh Subsidiary to a third party.    Therefore, Ricoh warranties that Net Sales as defined in this Agreement shall equal the worldwide Net Sales by Ricoh of Digital Cameras as reported, internally and externally, by Ricoh.

4.10   Should any of the conditions or warranties in Paragraphs 4.6, 4.7, 4.8 or 4.9 not be met, the parties shall meet within thirty (30) days and will agree upon a revised accounting mechanism for royalties due that will meet the above conditions and warranties and Ricoh will remit any past underpayments plus interest with its next payment to satisfy its obligations hereunder.

## ARTICLE V

## ROYALTY STATEMENTS, PAYMENTS, RECORDS AND ACCOUNTS

5.1    During January, April, July and October following each calendar quarter, or portion thereof, in which this Agreement is in force, Ricoh shall, with respect to Ricoh Licensed Products sold during the preceding calendar quarter, furnish to Kodak, with a copy to ATLC:

    i.    a written royalty statement separately setting forth:

        a.    the Net Sales during the preceding calendar quarter; and

        b.    the royalty accruing thereon;

        c.    the exchange rate(s) used; and

    ii.    within forty-five (45) days of the end of   each calendar quarter, payment of said royalty.

    If no royalty shall have accrued hereunder during any such calendar quarter or portion thereof, such statement shall so report.

5.2    Within sixty (60) days after termination of this Agreement, Ricoh shall furnish to Kodak a similar royalty statement and payment covering all Ricoh Licensed Products made prior to the termination date, but as to which royalty has not been paid hereunder.

10

dih710: 4/24/02

KOD-RIC005760

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY

5.3    Ricoh shall maintain complete and accurate records as to royalties due hereunder, and shall retain such records for three (3) years after submitting the royalty statement to which they pertain. Such records may, upon seven (7) days written notice to Ricoh by Kodak and at Kodak's expense, be audited during business hours by PricewaterhouseCoopers LLP ("the Auditor"). The Auditor shall report to Kodak only the royalties due and the methods used in calculating such royalties. If any such examinations reveals that Ricoh owes Kodak additional royalties, such additional royalties shall be paid within sixty (60) days following completion of the respective examination plus interest on such additional royalties at the rate specified in Paragraph 4.5 for the period commencing on the date on which such royalties were originally due and ending on the date in which payment is actually made.

5.4    All payments to Kodak hereunder shall be made in United States currency. All payments to be made by Ricoh to Kodak under this Agreement shall be made in United States Dollars by telegraphic transfer and shall be made payable to and addressed to:

> Citibank N.A. New York, NY
> 399 Park Avenue
> New York, NY 10043
> Account Name: Eastman Kodak Company
> Account No.: 00029217
> Account Type: Checking
> Bank ABA Routing No.: 021000089
> Description-Reference: Ricoh DC License

5.5    No taxes or other charges shall be deducted from such payments, except income tax which is fully creditable by Kodak against United States income tax under the foreign tax credit provisions of the Internal Revenue Code of the United States; Ricoh shall reimburse Kodak for any such taxes and charges (except for the above-described income taxes) that Kodak may be required to pay and/or that Ricoh is required by law to deduct from payments made hereunder.

5.6    To the extent Ricoh's Net Sales are or were invoiced in Yen, Euros, or other currency and must be converted into U.S. currency for calculation of the royalty due hereunder, the exchange rate shall be calculated using the average daily Telegraphic Transfer Middle Rate ("TTMR") exchange rate as reported by Tokyo Mitsubishi Bank over the period for which royalties are being reported.

dih710: 4/24/02

Confidential

KOD-RIC005761

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY _____

## ARTICLE VI

## TERM AND TERMINATION

6.1   Term.  This Agreement and the rights granted hereunder shall continue in effect for a period of ten (10) years from the Effective Date of this Agreement.

6.2   Termination.

    i.   If Ricoh shall fail or refuse to comply with any of its obligations hereunder, Kodak may give Ricoh written notice of such failure or refusal, and if, within thirty (30) days after such notice, Ricoh fails to remedy such failure or refusal, then in addition to its other legal remedies, Kodak shall have the right to terminate this Agreement and the licenses granted to Ricoh herein, effective upon written notice to that effect.  Failure by Kodak to give any such notice or to invoke the termination provision of this Paragraph shall not condone or excuse any such failure or refusal by Ricoh.

        Termination of Ricoh's license by Kodak under this Paragraph shall not terminate Kodak's license and Ricoh's non-assertion under Paragraph 3.2, which licenses and non-assertion shall survive for the lives of the Ricoh Patents.

    ii.   Kodak may terminate this Agreement upon sixty (60) days written notice of termination to Ricoh given at any time upon or after:

        a.   the filing by Ricoh of a petition in bankruptcy or insolvency;

        b.   any adjudication that Ricoh is bankrupt or insolvent;

        c.   the filing by Ricoh of any petition or answer seeking reorganization, readjustment or arrangement of its business under any law relating to bankruptcy or insolvency;

        d.   the appointment of a receiver for all or substantially all of the property of Ricoh;

        e.   the making by Ricoh of any assignment for the benefit of creditors;

12

dih710: 4/24/02

KOD-RIC005762

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY _____

    f.    the institution of any proceedings for the liquidation or winding up of Ricoh's business or for the termination of its corporate charter.

In the event of termination under this Paragraph 6.2(ii) the rights and licenses granted to Ricoh shall terminate while the rights and licenses granted to Kodak shall survive for the lives of the Ricoh Patents.

6.3    Survival.  The provisions of Articles 2, 4, 5.2, 5.3, 5.4, 5.5, 5.6, 7 and 8.4 will survive any termination or expiration of this Agreement.

## ARTICLE VII

## NOTICES/REPORTS

Any notice required or permitted to be given hereunder shall be in writing and shall be addressed, in the case of Ricoh to:

    Mr. Hisao Yuasa
    General Manager Legal Division
    Ricoh Company, Ltd.
    No. 15-5, Minami
    Aoyama 1-chome
    Minato-ku, Tokyo 107-8544 Japan
    Telephone:  011-81-3-5411-4426
    Facsimile:   011-81-3-5413-6651

Any notice and royalty reports required or permitted to be given hereunder shall be in writing and shall be addressed, in the case of Kodak to:

    Eastman Kodak Company
    Attention:   Douglas Hague, Director
    Intellectual Property Transactions
    Corporate Commercial Affairs
    343 State Street
    Rochester, New York 14650-0211
    Telephone:  (716) 724-4181
    Facsimile:   (716) 724-9563

13

dih710: 4/24/02

Confidential

KOD-RIC005763

or to such other address or addresses as either of these companies may from time to time designate as its address by notice in writing to the other. All notices and royalty reports so addressed are effective when received.

With a copy of said notices and royalty reports sent to ATLC at:

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
RECLASSIFY

> André-Troner L. C.
> 100 Rialto Place
> Suite 950
> Melbourne, Florida 32901
> Telephone:   (407) 725-9605
> Facsimile:   (407) 725-1527

## ARTICLE V111

## MISCELLANEOUS

8.1   (a)   No reference to this license and no trademark, tradename or trade dress or copyrighted work of Kodak or its Subsidiaries shall appear on product that is made by Ricoh or its Subsidiaries under this Agreement or on its packaging or in advertising or promotional materials for such product.

      (b)   No reference to this license and no trademark, tradename or trade dress or copyrighted work of Ricoh or its Subsidiaries shall appear on product that is made by Kodak or its Subsidiaries under this Agreement or on its packaging or in advertising or promotional materials for such product.

8.2   Except as otherwise expressly provided herein, nothing contained in this Agreement shall:

      i.    Grant any license or sublicensing right or confer any right, by implication, estoppel or otherwise, such as under any patent application or patent;

      ii.   Impose any obligation to furnish any technical information or to file or prosecute any patent application, or maintain any patent in force;

      iii.  Impose any obligation or confer any right to enforce any patent; or

14

dih710: 4/24/02

KOD-RIC005764

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
DECLASSIFY _____

iv.   Constitute any representation, warranty, assurance, guarantee or inducement whatsoever by Kodak.

8.3   Neither this Agreement nor any license granted herein shall be assignable or otherwise transferable by Ricoh or its Subsidiaries without written authorization of Kodak.   Any assessment or transfer without such authorization shall be null and void.

8.4   This Agreement which shall be governed by the substantive laws of New York State without regard to its conflicts of laws provisions, constitutes the entire Agreement between the parties with respect to the subject matter hereof.  Any modification of this Agreement shall be set forth in writing and duly executed by both parties.


## ARTICLE IX

### CONFIDENTIALITY

The parties hereto shall keep the terms of this Agreement confidential and shall neither disclose now or hereafter, nor permit any of its Subsidiaries to now or hereafter divulge, the terms of this Agreement to any third party except:

(a)   to any court or governmental body or agency compelling such disclosure, but only to the extent so compelled; or

(b)   as otherwise may be required by any law and the rules or regulations promulgated under such law; or

(c)   either party may convey to third parties that this Agreement exists, and the fact that a royalty-bearing patent license has been entered into between Ricoh and Kodak; provided that the compensation amount not be disclosed.

dih710: 4/24/02

Confidential

KOD-RIC005765

EASTMAN KODAK COMPANY
CONFIDENTIAL INFORMATION
CONTROLLED DISTRIBUTION
DECLASSIFY

**IN WITNESS WHEREOF,** the parties have caused their respective corporate names to be affixed hereto and this instrument to be signed by their duly authorized officers, all as of the day and year first above written.

**EASTMAN KODAK COMPANY**

By: _____

Printed Name: _WILLY C. SHIH_

Title: _SENIOR VICE PRESIDENT_

**RICOH COMPANY, LTD.**

By: _____

Printed Name: _YASUAKI ISHII_

Title: _General Manager_

dih710: 4/24/02

16

g.i    wcs

Confidential

KOD-RIC005766