**REDACTED**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EASTMAN KODAK COMPANY,

                Plaintiff,

        v.

RICOH COMPANY, LTD.

               Defendant.

Case No. 12-CV-3109 (DLC)

## RICOH'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RELIEF FROM JUDGMENT

REDACTED

## TABLE OF CONTENTS

**Page**

BACKGROUND ..........................................................................................................3

    Kodak Is Entitled to Only One Royalty Per Camera .........................................................3

    Kodak Received Royalties From OEMs..............................................................................4

    Ricoh Seeks Discovery To Verify Royalty Payments by OEMs........................................6

    The Parties' Counsel and Experts Miscalculate Royalty Payments by OEMs...................8

    The Parties' Stipulation Was Predicated on These Miscalculations.................................10

    Ricoh Discovers the Mistakes and Obtains Confirmatory Evidence................................10

ARGUMENT ...........................................................................................................................11

    The Court Should Correct the Mistaken Portions of the Judgment .................................11

        The Court Should Reduce the Judgment To Account for Royalty Payments
        Previously Paid by Sanyo .........................................................................................13

    In the Alternative, the Court Should Schedule a Hearing on Sanyo's Payments to
    Kodak.................................................................................................................................19

CONCLUSION.........................................................................................................................19

**REDACTED**

On November 5, 2013, this Court entered judgment in favor of Kodak and against Ricoh for breach of the Kodak/Ricoh Patent License Agreement ("PLA"). (Dkt. No. 203 ("Judgment").) Pursuant to the parties' October 20, 2013 Joint Stipulation ("Stipulation"), the Judgment included $17.7 million in damages for royalties on digital cameras Pentax purchased from Sanyo, Asia Optical, and Altek, three original equipment manufacturers ("OEMs") that had entered into patent license agreements with Kodak. *See* Judgment at 1 & Ex. A.

The Judgment and Stipulation incorporate the principle, which Kodak has conceded throughout this case, that Kodak does not seek—and cannot recover—royalties on digital cameras for which a royalty has already been paid by an OEM. Indeed, the Judgment and Stipulation make this principle controlling in the award of damages for digital cameras sold to Pentax by OEMs. Thus, while the $17.7 million damages figure included in paragraph 5(b) of the Judgment reflected the parties' understanding and agreement at the time—*i.e.*, that the evidence supported the conclusion that the OEMs had not made royalty payments on all sales to Pentax—the Judgment expressly incorporates the parties' stipulation that changes in the status of payments by the OEMs to Kodak may warrant modification of the Judgment even after it has become final and enforceable. Paragraph 12 of the Stipulation (incorporated as Exhibit A to the Judgment) provides that Ricoh may "seek to modify, vacate, or obtain other relief from judgment with respect to the stipulated dollar amount set forth in paragraph 5(b) under the Federal Rules of Civil Procedure, Federal Rules of Appellate Procedure, and/or other applicable authorities with respect to any payments that [the OEMs] make to Kodak to the extent such payments represent payments on Pentax digital cameras." Thus, the Judgment and Stipulation reflect the overriding principle that Kodak cannot obtain a double recovery—that any payment by an OEM bars recovery for that sale in this case. And the Judgment and Stipulation make clear that the rule

**REDACTED**

against double recovery is more important than finality by expressly providing for a right to seek alteration of the Judgment based on any payments by the OEMs, regardless of how much time has passed since entry of Judgment.

It has now become clear that the parties' counsel and experts miscalculated the number of cameras for which Sanyo had already paid royalties. In fact, as explained below, Sanyo has paid <u>all</u> the royalties due on its sales to Pentax during the course of Sanyo's patent license agreement with Kodak. The dollar amount in the Judgment would therefore overcompensate Kodak by $8.46 million including interest. Accordingly, Ricoh now invokes paragraph 12 of the Stipulation as well as Rule 60(b) of the Federal Rules of Civil Procedure to alter the Judgment to correct the miscalculation of Sanyo's royalties. Absent modification, the Judgment would work a manifest injustice on Ricoh and provide an inappropriate windfall to Kodak. Moreover, granting relief and correcting the Judgment is consistent with the parties' stipulations and intent, which themselves are incorporated in the Judgment and Stipulation, and with cases governing relief under Rule 60(b). Ricoh has acted diligently throughout the case and promptly brought the need for correction to Kodak's and the Court's attention. Moreover, there will be no prejudice to Kodak from correcting the Judgment. Less than four months have elapsed since entry of Judgment, and at all times the Judgment has remained unenforceable and subject to this Court's jurisdiction and potential reconsideration. Most importantly, the Judgment and Stipulation envisioned the need for just such corrections and clearly placed the principle of no double recovery ahead of any interests Kodak may have in finality.

For these reasons, described in more detail below, paragraph 5(b) of the Judgment should be modified to replace "$17.7 million" with "$10.0" million. In addition, paragraph 5(e) of the Judgment should be modified to replace "$4.83 million" with "$4.06 million" to account for

REDACTED

interest on the improperly included damages.

**BACKGROUND**

On October 20, 2013, Kodak and Ricoh entered into the Stipulation to determine, among other things, the amount to be paid by Ricoh "for Pentax point and shoot digital cameras manufactured for Pentax by OEMs." (Judgment, Ex. A at ¶ 5(b).) The parties intended the stipulated damages amounts to exclude any royalties already paid by the OEMs. As set forth below, however, the calculated damages included pre-paid royalties of $7.7 million that should have been excluded from the Judgment.

### Kodak Is Entitled to Only One Royalty Per Camera

Kodak admits it is entitled to only one royalty per camera. If another party has already paid royalties on a particular sale, Kodak cannot seek royalties from Ricoh for the same sale. Indeed, Kodak has repeatedly assured Ricoh and the Court that "Kodak is not seeking royalties on products for which royalties have already been paid." (Dkt. No 123 [Kodak's Reply in Support of Motion for Partial Summary Judgment] at 3 fn.3.)[1]

Likewise, the Court has also acknowledged that Kodak cannot recover twice for royalties on a single camera:

> Kodak agrees, as it must, that it cannot collect royalties twice from the same —from the sale of the same camera. So if one party pays royalties pursuant to an agreement, it doesn't have the right to go after another party

---

[1] *See also* (Ex. 1 [April 5, 2013 Letter from Lalli to Cohen] ("The PLA excuses Ricoh from paying royalties on specific Pentax sales only if royalties have already been paid to Kodak on those sales. (*See* §§ 3.8, 4.4.)"); Ex. 2 [May 1, 2013 Letter from Hirsch to the Court] ("Kodak does not dispute that it cannot collect royalties twice on the same digital cameras."); Dkt. No. 178 [Kodak's Opposition to Ricoh's Daubert Motion] at 6 ("[Ricoh is] responsible for royalty payments on Digital Cameras that Ricoh, or an acquired business like Pentax, purchased from a licensed OEM that had not itself paid royalties.").) "Ex." refers to exhibits to the Declaration Of David Eiseman in Support of Ricoh Company, Ltd.'s Motion For Relief From Judgment ("Eiseman Decl.") submitted herewith.

**REDACTED**

> to collect royalties again for the sale of that camera. . . . . Kodak admits it
> has no right to recover double royalties.

(Ex. 3 [May 8, 2013 Hearing Transcript] at 3, 5.)  Indeed, the Court acknowledged that "Ricoh is absolutely entitled to make sure that it's not being asked through this lawsuit to pay redundant royalties."  (*Id.* at 3)  In granting Partial Summary Judgment, the Court once again noted that Kodak "conce[eds] that it will not seek a double recovery of licensing fees."  (Dkt. No. 105 [Order Granting Partial Summary Judgment] at 32.)

Kodak's admission that it will not seek double recovery underpins the Court's Partial Summary Judgment Order, which in turn forms the basis for the parties' Stipulation and the Court's Judgment.  (*See* Judgment at 1.)  And the Judgment itself preserved the rule against double recovery and placed it above interests in finality by incorporating Ricoh's ability to seek to alter or modify the Judgment in the event there is a change in OEM payments, regardless of how much time has passed since entry of Judgment.  (*Id.*, Ex. A at ¶ 12.)

**Kodak Received Royalties From OEMs**

During the term of the PLA, Kodak regularly received royalties from OEMs pursuant to patent license agreements between Kodak and each OEM.  (Ex. 4 [Patent Licensing Agreement Between Kodak and Sanyo].)  Pentax is not a party to these patent license agreements.  However, the patent license agreements authorized the OEMs to make sales to Pentax and further required the OEMs to pay royalties on all such sales to Pentax.  Pentax purchased a substantial number of the cameras at dispute in this case from the OEMs subject to these patent license agreements with Kodak.  (Ex. 5 [April 26, 2013 Letter from Mooney to the Court].)  Ricoh and Kodak agreed that, at the very least, Kodak cannot recover damages on any sales for which it had already received royalty payments from the OEMs.  *See* Section I.A. above.

**REDACTED**

Although the patent license agreements required the OEMs to pay royalties on all sales to Pentax, neither Pentax nor Ricoh could verify whether the OEMs had complied with their royalty obligations.  To determine the scope of potential double recovery, therefore, Ricoh issued to Kodak its First Set of Requests for the Production of Documents on August 6, 2012.  (Ex. 6. [Ricoh's First Set of Requests for the Production of Documents and Things])  Among other things, Ricoh specifically requested production of all "documents and things concerning any royalties . . . received by Kodak based on the sales . . . by Pentax's OEM manufacturers."  (*Id.*, RFP No. 43.)

In an effort to avoid potentially expensive party and third-party discovery, the parties agreed to suspend formal discovery on OEM payments while they worked toward a stipulation that would have eliminated OEM sales from the case.  (Ex. 13 [May 6, 2013 Letter from Mooney to the Court].)  As agreed, Ricoh did not move to compel production of OEM-related information during the approximately five months of negotiations with Kodak.  Instead, Ricoh worked toward what it believed would be a cooperative investigation with Kodak.  (*Id.*)  At Kodak's request, Ricoh gathered (and authorized its counsel to share) highly-sensitive purchasing information summarizing Pentax's quarterly purchases from each OEM (the "Pentax Spreadsheet").  (Declaration Of Brian C. Becker In Support Of Ricoh Company, Ltd.'s Motion For Relief From Judgment ("Becker Decl.") at Ex. 2 [Exhibit B to Ricoh's April 25, 2013 Responses to Kodak's Third Set of Interrogatories].)

Kodak was not as forthcoming.  Instead of providing any reciprocal information or analysis, Kodak's counsel simply rejected the Pentax Spreadsheet as insufficient in itself to verify royalty payments from OEMs.  (Ex. 1 [April 5, 2013 Letter from Lalli to Cohen].)  Shortly

5

**REDACTED**

thereafter, the parties terminated further negotiations and were forced to resume formal discovery.  (Ex. 5 [April 26, 2013 Letter from Mooney to the Court.].)

### Ricoh Seeks Discovery To Verify Royalty Payments by OEMs

With less than one month remaining in fact discovery—and still without access to relevant information—Ricoh demanded production pursuant to its First Set of Requests for the Production of Documents.  (Ex. 7 [April 12, 2013 E-mail from Cohen to Lalli].)  Among other things, Ricoh requested detailed information regarding OEM royalty payments, including the volume, models, prices and revenues for any sales to Pentax.  (*Id.*)  Ricoh also issued a Third Notice of Deposition Pursuant to F.R.C.P. 30(6)(b) on April 12, 2013 to obtain testimony regarding royalties Kodak received under the patent license agreements with OEMs.  (Ex. 8 [Ricoh's Third Notice of Deposition Pursuant to F.R.C.P 30(b)(6)])

In response, Kodak agreed to produce certain documents within its possession, including royalty reports it periodically received from OEMs under the patent license agreements.  (*Id.*)  Ricoh was concerned, however, that the reports did not contain the detailed information necessary to verify the royalty payments on sales to Pentax.  (Ex. 3 [May 8, 2013 Hearing Transcript] at 6.)  In an effort to fully understand the royalty payments, Ricoh moved to compel testimony regarding the OEMs' obligations under the patent license agreements.  (*Id.* at 9.)  Given the significance of the royalty amounts, Ricoh "want[ed] to be sure" it understood the reporting information required by the patent licensing agreements and sought all available documentary and witness testimony from Kodak.  (*Id.* at 11.)

In particular, Ricoh deposed Kodak's Worldwide Business Unit Controller, John W. Valenza, on the factual question of "whether any royalties were paid specifically on sales to Pentax."  (Ex. 9 [Valenza Tr.] at 178.)  On this question, Mr. Valenza acknowledged that the royalty reports themselves do not contain sufficiently detailed information to verify whether the

**REDACTED**

OEMs had paid royalties on all sales to Pentax.  (*Id.* at 91-94.)  Ricoh pressed Mr. Valenza on

whether Kodak ever attempted to obtain additional information from the OEMs.  (*Id.* at 31-32,

92.)  In response, Mr. Valenza represented that during the course of its patent license agreements

with the OEMs, Kodak was "continuously" in contact with the OEMs and had "ask[ed] for all of

their data . . . all of the details, but what we have is what we've been given."  (*Id.* at 31, 32, 36.)

Specifically with respect to Sanyo, Mr. Valenza represented that: "(1) Kodak has seen no

evidence that Sanyo had paid royalties on all of its sales of digital cameras to Pentax, (2) Sanyo

never represented to Kodak that it paid royalties on all of its sales of digital cameras to Pentax,

and (3) despite Kodak's requests for additional information relating to Sanyo's royalty payments,

Sanyo did not provided any information showing it paid royalties on all of its digital camera

sales to Pentax."  (Ex. 10 [Thomas First Supplemental Report]) at 4 (summarizing and relying

upon testimony by Mr. Valenza) (internal citations omitted)).[2]

    As discussed below, however, Mr. Valenza was mistaken in his understanding of the

available information.  In fact, Sanyo could have confirmed that Kodak had received payment in

---

[2] *See also* (Ex. 9 [Valenza Tr.] at 12 ("I don't have that information [regarding models, volume, price and revenues for sales to Pentax].  We've tried to get that information."); 19 ("Kodak continuously requests camera model and brand detail from all of their licensees, so that has been a continuous effort that we conduct on a regular basis with all our licensees. We are continually trying to get that information."); 21 ("Kodak has asked on numerous occasions for each of these parties to include detail on camera models, quantities, sales revenue on their royalty reports."); 32 ("[W]e've been reaching out to them since we entered into a license agreement; on a regular basis, continuously tried to obtain this level of detail."); 36 ("We've done everything in our power, short of litigation, to get the information."); 38-39 ("We asked numerous times for the report that has the—for the reports to provide that level of detail of cameras by make, model, quantity, sales revenue."); 40 ("I believe Kodak has done everything we can to try to get the data."); 42 ("We've gotten everything we can."); 44 ("On an ongoing basis we're trying to get more detail on the royalty reports so we can identify by manufacturer, model, detailed information that would allow us to assess the completeness of the royalty reports."); 68 ("We've asked for detailed information from all of our licensees."); 84 ("[W]e have continuously gone back to Sanyo to ask them for detailed information for all of their OEM cameras, and this is all the information that we've been able to obtain."); 92 ("[W]e continuously asked for additional details . . . but this is what we've been able to obtain.").)

**REDACTED**

full from Sanyo for royalties on all sales to Pentax.  (Declaration of Mitsuhiko Maeda in Support of Ricoh Company, Ltd.'s Motion For Relief From Judgment ("Sanyo Decl.") at ¶ 15.) However, at no point during this case did Kodak ever ask Sanyo for such confirmation.  (*Id.*)

### The Parties' Counsel and Experts Miscalculate Royalty Payments by OEMs

Based on Mr. Valenza's testimony, both parties proceeded on the mistaken assumption that there was no available data to directly verify royalty payments received by Kodak from OEMs on the OEMs' sales to Pentax.  Consequently, the parties were left to indirectly calculate the royalty payments by cross-checking the summary royalty information in the reports from OEMs against the summary purchase information previously prepared by Ricoh in the Pentax Spreadsheet.  (Ex. 9 [Valenza Tr.] at 91-93; *see also* (Ex. 11 [Excerpts From the Thomas Report] at 29-32.)  Due to the highly sensitive nature of the information, only the parties' outside counsel and damages experts had access to the data to perform this detailed cross-comparison analysis. (Dkt. No. 26 [November 7, 2012 Stipulated Protective Order] at ¶ 6).  Ricoh's in-house team was precluded from receiving copies of Kodak or OEM sales reports and only had access to a heavily redacted report from Kodak's damages expert.  (Becker Decl. at Ex. 3 [Sanyo Royalty Reports]; Ex. 14 [Excerpts From the Redacted Thomas Report] at 30-31].)  This meant Ricoh's in-house team had no access to one of the two sources being compared or to the expert's cross-comparison itself, and therefore was not in a position to discover the expert's cross-comparison error.

Ricoh has since discovered that the parties' outside counsel and damages experts were working under mutual misunderstandings.  Both parties' counsel and experts misinterpreted data from the Pentax Spreadsheet.  As explained by Kodak's damages expert, Vincent Thomas, the cross-comparison analysis required matching the camera models identified in Sanyo's royalty reports on a quarterly basis with the camera models identified in the Pentax Spreadsheet.  (Ex. 11

8

**REDACTED**

[Excerpts From the Thomas Report] at 30-32.)  Where there was a mismatch in any quarter, Mr. Thomas concluded that Sanyo had failed to pay royalties on sales of the unmatched camera models.  (*Id*.)

But what the parties' counsel and experts did not realize was that, whereas Mr. Thomas had coded the Sanyo royalty reports by *calendar* quarter (with Q1 beginning in January), the Pentax Spreadsheet was produced using Pentax's *fiscal quarters* (with Q1 beginning in April). For example, when Mr. Thomas reviewed Sanyo's royalty report for "Reporting Period; January 1st, 2003 to March 31st, 2003," he coded the camera models in his analysis under "Q1 2003." (*See* Ex. 11 [Excerpts From the Thomas Report] at 26; Becker Decl. at Ex. 3 [Sanyo Royalty Reports].)  Mr. Thomas then compared the camera models he had coded under "Q1 2003" against the camera models listed in the Pentax Spreadsheet under "2003/1Q."  (Becker Decl. at Ex. 2 [Exhibit B to Ricoh's April 25, 2013 Responses to Kodak's Third Set of Interrogatories].) So, in performing his analysis, Mr. Thomas was actually comparing Sanyo royalty payments for the period of January to March to Pentax purchases for the period of April to June.  This mismatching of time periods resulted in Mr. Thomas' conclusion that Sanyo had not paid royalties on a total of █████ digital cameras that it had sold to Pentax.  (Ex. 12 [Thomas Second Supplement at Appendix J].)

When the mistake is corrected, Mr. Thomas' methodology reveals there is no mismatch between the Sanyo royalty reports and the Pentax Spreadsheet.  (Becker Decl. at ¶ 5.)  That is, Mr. Thomas' methodology confirms all the sales from Sanyo to Pentax identified in the Pentax Spreadsheet during the course of Sanyo's patent license agreement with Kodak are reflected in Sanyo's royalty reports to Kodak.  (*Id*.)  And, as discussed below, Sanyo has independently confirmed this conclusion.  (Sanyo Decl. at ¶¶ 12-15.)

**REDACTED**

### The Parties' Stipulation Was Predicated on These Miscalculations

Before Ricoh discovered these mistakes, both parties relied on the mistaken cross-comparison analysis to calculate damages for the Stipulation. In particular, paragraph 5(b) of the Stipulation specifies $17.7 million in damages on sales from OEMs. To prevent double recovery, the parties calculated this damages amount to exclude any royalties that had already been paid to Kodak by the OEMs. As paragraph 4 of the Stipulation explicitly confirms, the damages amounts reflect the parties' mutual understanding that "none of the royalties Kodak is seeking have already been paid by any of the [OEMs] or by any other entity." Because of the mistakes in the cross-comparison analysis, however, the damages amount erroneously included $7.7 million for sales from Sanyo. (Becker Decl. at ¶ 12.) Correcting for this mistake to avoid double recovery, as the parties intended, the total $17.7 million in damages should be reduced to $10.0 million. (*Id.*) In addition, the $4.83 million in interest should be reduced to $4.06 million. (*Id.* at ¶ 13.)

### Ricoh Discovers the Mistakes and Obtains Confirmatory Evidence

Following the entry of the Judgment, Ricoh began investigating potential indemnification claims to recover the $17.7 million in damages for purchases from OEMs. In connection with this investigation, Ricoh discovered the mistakes the parties' counsel and experts had made in performing the cross-comparison analysis for Sanyo. Ricoh also discovered that Sanyo could confirm having made royalty payments on sales to Pentax. (Sanyo Decl. at ¶¶ 5-15.) At Ricoh's request, Sanyo identified the relevant information within Sanyo's sales databases and confirmed that Sanyo had paid Kodak all royalties on Sanyo's sales to Pentax during the course of Sanyo's patent license agreement with Kodak. (*Id.*)

Thereafter, Ricoh timely alerted Kodak to the mistakes in the Judgment. (Eiseman Decl. at ¶ 15.) In response, Kodak did not dispute that the parties and their counsel mistakenly

**REDACTED**

calculated the amount of royalties that Sanyo had paid to Kodak on Sanyo's sales to Pentax during the course of Sanyo's patent license agreement with Kodak.  (Ex. 15 [February 18, 2014 Email from Summersgill to Eiseman].)  Nor did Kodak identify any undue prejudice it had suffered in the past few months in reliance on the Judgment.  (*Id.*)  Kodak, however, refused to stipulate to modify the Judgment.  (*Id.*)  Consequently, Ricoh now brings this motion for relief under paragraph 12 of the Stipulation and Federal Rule of Civil Procedure 60(b).

**ARGUMENT**

### The Court Should Correct the Mistaken Portions of the Judgment

The Judgment incorporates Ricoh's stipulated right to seek to modify or amend the Judgment in the event circumstances change concerning OEM royalty payments.  Paragraph 12 of the Stipulation reflects the parties' agreement that the need to avoid double recovery by Kodak was more important than the interests in finality that generally follow entry of Judgment.  (*See* Judgment, Ex. A. at ¶ 12.)  Thus, while this motion seeks to alter the Judgment, it does so on grounds expressly provided in the Stipulation incorporated in the Judgment itself.  In addition, this motion is based on Federal Rule of Civil Procedure 60(b), which provides that a court may relieve a party or its legal representative from a final judgment due to "mistake, inadvertence, surprise, or excusable neglect," or "any other reason that justifies relief."  The Rule "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice [and] it constitutes a grand reservoir of equitable power to do justice in a particular case." *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004) (internal quotation omitted).  Where the aggrieved party moves within a reasonable time, the Rule "should be liberally construed when substantial justice will thus be served." *LeBlanc v. Cleveland*, 248 F.3d 95, 100 (2d Cir.2001) (*quoting Radack v. Norwegian America Line Agency, Inc.*, 318 F.2d 538, 542 (2d Cir. 1963)).

Ricoh seeks to alter the Judgment because it incorporates a multi-million dollar

REDACTED

miscalculation in damages.  To be clear, Ricoh is not seeking to unwind its stipulated resolution due to buyer's remorse or "[m]ere dissatisfaction in hindsight."  *Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986).  On the contrary, Ricoh asks the Court only to conform the Judgment to reflect the parties' mutual intent, through the means and on the grounds incorporated in the Judgment and Stipulation.  Then, as now, the parties agree that Kodak cannot recover twice for royalties on the same camera and that the stipulated damages should exclude all instances of double recovery by excluding all sales where an OEM had already paid a royalty to Kodak.  What Ricoh has just discovered is that the parties' initial calculation failed to accomplish this mutual intent.  *See Mazzone v. Stamler*, 157 F.R.D. 212, 214 (S.D.N.Y. 1994) (granting Rule 60 relief from stipulated dismissal based on mutual mistake); *see also Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980) (affirming relief from judgment based on stipulated facts where party "present[ed] a previously undisclosed fact so central to the litigation that it shows the initial judgment to have been manifestly unjust . . . even though the original failure to present that information was inexcusable").

While the parties did not discover this mistake prior to entry of Judgment, Kodak suffers no undue prejudice from a delay of less than four months, especially because the Judgment has at all times remained unenforceable and subject to this Court's jurisdiction and reconsideration. Moreover, consistent with paragraph 12 of the Stipulation, Ricoh seeks to alter the damages judgment based on royalty payments by OEMs.  That the payments in question occurred in the past and were mistakenly omitted by the parties from the damages stipulations hardly gives rise to any prejudice to Kodak.

Without relief from this Court, the Judgment would work a manifest injustice on Ricoh and provide Kodak a windfall of $7.7 million in royalties it has already collected from Sanyo.

**REDACTED**

Under the circumstances, the Court should correct the Judgment under Rule 60(b). *See In re UAL Corp.*, 411 F.3d 818, 824-25 (7th Cir. 2005) (affirming grant of relief under Rule 60(b), reasoning that "[w]hen an innocent mistake can be rectified without harm to anyone (loss of a windfall is not the kind of harm that a court should endeavor to avert), it should be").

## The Court Should Reduce the Judgment To Account for Royalty Payments Previously Paid by Sanyo

Due to the parties' mistake, excusable neglect and as a matter of equity, Ricoh respectfully asks that the Court reduce the damages in paragraph 5(b) of the Judgment to account for the royalty payments previously paid by Sanyo. Based on the calculations underlying the Stipulation, the amount to be deducted from the Judgment is ascertainable without any further discovery. It is thus within the Court's equitable discretion to make a simple modification to the Judgment and reduce the damages awarded to Kodak in the Judgment by $8.46 million, including interest awarded.

## The Court Should Grant Relief Due to Mistake and/or Excusable Neglect

Rule 60(b)(1) empowers a court to grant relief from judgment due to "mistake" or "excusable neglect." *In Re 310 Assoc's*, 346 F.3d 31, 34-35 (2d Cir. 2003) (affirming district court order vacating prior order based on factual mistake of court); *Peterson v. Term Taxi Inc.*, 429 F.2d 888, 891 (2d Cir. 1970) (reversing denial of Rule 60(b) motion in light of excusable neglect of party). The Rule encompasses mistakes by a party or its counsel, *Matter of Emergency Beacon Corp.*, 666 F.2d 754, 759 (2d Cir. 1981), as well as mutual mistakes based on a shared misunderstanding of the underling facts. *See EMI Entertainment World, Inc. v. Karen Records*, 05 Civ. 390, 2013 WL 2480212, at * 3 (S.D.N.Y. June 10, 2013) (vacating judgment where both parties and court shared mistaken understanding as to plaintiff's status as copyright holder). "All doubts should be resolved in favor of those seeking relief" under Rule 60(b), and it

**REDACTED**

is appropriate to grant relief under Rule 60(b)(1) even where the mistake occurs at the fault of the aggrieved party. *See Davis v. Musler*, 713 F.2d 907, 917 (2d Cir. 1983) (reversing district court order denying relief where party mistakenly assumed that documents related to separate proceeding); *In re DiGeronimo*, 354 B.R. 625, 633, 644 (E.D.N.Y. 2006) (vacating judgment and adjusting damages upon reconsideration despite movant having willfully missed filing deadline).

The determination of excusable neglect is an equitable one, "taking account of all relevant circumstances surrounding the party's omission." *Pioneer Investment Services Co. v. Brunswick Associates, L.P.*, 507 U.S. 380, 395 (1993). As the Supreme Court has recognized, there exists "a range of possible explanations for a party's failure[s]," from acts of God at one end to conscious disregard at the other. *Id.* at 387–88. The term "excusable neglect" is an "elastic concept" that includes omissions due to carelessness. *See Green ex rel. Estate of Green v. Advanced Cardiovascular Imaging*, 07 CIV.3141 JCF, 2009 WL 3154317, at *3 (S.D.N.Y. Sept. 30, 2009); *Katz v. Mogus*, 07 Civ. 8314(PKC)(KNF), 2012 WL 263462, at *3 (S.D.N.Y. Jan. 25, 2012). Among other things, the court may consider the length and reasons for the delay, whether the moving party acted in good faith, and the danger (if any) of prejudice to other parties. *See In re 401 East 89th St. Owners, Inc.*, 223 B.R. 75, 79-80 (S.D.N.Y. 1998).

Regardless of whether the Court considers the damages miscalculation a product of mistake or excusable neglect, relief under Rule 60(b) is clearly warranted. There can be no doubt the parties entered the Stipulation based on a mistaken calculation of the amount of royalties already paid by Sanyo. Prior to the Stipulation, Kodak's sole basis for believing that Sanyo had underpaid any royalties was an apparent mismatch between the Sanyo royalty reports and the Pentax Spreadsheet. (Ex. 11 [Excerpts From the Thomas Report] at 29-32.) This conclusion was based on a mistaken interpretation of the purchase data summarized in the Pentax

**REDACTED**

Spreadsheet.  Once that mistaken assumption is corrected, Kodak's own calculations confirm a complete match between the Sanyo royalty reports and the Pentax Spreadsheet for the period of Sanyo's patent license agreement with Kodak.  Moreover, Sanyo's own internal records reflect that it has in fact paid royalties on all such sales to Pentax.  Sanyo's independent verification confirms that the parties' Stipulation was based on a mistaken identification of unpaid royalties. *See, e.g.*, *Vasquez v. Carey*, 03 CIV. 3905(RJH), 2010 WL 1140850, at *10 (S.D.N.Y. Mar. 24, 2010) (granting relief from stipulated dismissal based on a misidentification that was "the result of a combination of decisions made by all parties in the case"); *cf. Carnegie v. Miller*, 86 CIV. 8658 (KMW), 1991 WL 221102, at *3 (S.D.N.Y. Oct. 16, 1991) (granting relief from dismissal where counsel for both parties "labored under the same misapprehension").

Moreover, Ricoh has acted reasonably and diligently at every turn.  First, Ricoh discovered the mistaken calculations shortly after the entry of Judgment and notified Kodak promptly.  (Ex. 15 [January 31, 2014 Email from Eiseman to Summersgill].)  As discussed above, both parties' counsel and experts were operating under a mutual misunderstanding regarding the scope of available data.  Based upon Kodak's representations during the litigation, Ricoh did not know that Sanyo could confirm its royalty payments to Kodak on sales to Pentax.  Without such information, the counsel and experts relied on an indirect calculation method that resulted in a significant error.  The miscalculation went undetected because the parties' counsel and experts assumed the quarters in the Sanyo royalty reports aligned with the quarters in the Pentax Spreadsheet.  That single mistake led to a miscalculation of millions of dollars and a Stipulation that failed to reflect the parties' mutual intent to avoid double recovery.  *See Katz*, 2012 WL 263462 at *4 (finding excusable neglect where "[b]oth sides . . . contributed to a not unreasonable delay"); *cf. Kurzweil v. Philip Morris Companies, Inc.*, 94 CIV. 2373 (MBM),

**REDACTED**

1997 WL 167043, at *4 (S.D.N.Y. Apr. 9, 1997) (granting relief where moving party demonstrated due diligence in bringing previously available but undisclosed evidence to the court's attention); *Gayle v. Harry's Nurses Registry, Inc.*, 07-CV-4672 NGG MDG, 2013 WL 5502950, at *3 (E.D.N.Y. Sept. 30, 2013) (reconsidering judgment to incorporate damages calculations previously omitted due to attorney negligence).

Second, Ricoh acted in good faith in diligently pursuing discovery with respect to royalty payments by the OEMs. From the outset of the case, Ricoh worked toward resolving this issue informally with Kodak. At Kodak's request, Ricoh gathered and summarized Pentax's purchasing information to assist the parties in understanding the scope of double recovery. When Kodak failed to provide reciprocal information, Ricoh resumed formal discovery to seek relevant documents and witness testimony. When Kodak failed to produce sufficiently detailed information, Ricoh moved to compel additional testimony to better understand the scope of the royalty payments made by the OEMs. Kodak's designated witness repeatedly assured Ricoh's counsel that no such detailed information was available from the OEMs. (*See, e.g.*, Ex. 9 [Valenza Tr.] at 21 ("Kodak has asked on numerous occasions for each of these parties to include detail on camera models, quantities, sales revenue on their royalty reports."); 84 ("[W]e have continuously gone back to Sanyo to ask them for detailed information for all of their OEM cameras, and this is all the information that we've been able to obtain."). ) The parties' counsel and experts worked in good faith to calculate damages based on the information that was available. The unfortunate miscalculation that resulted should not preclude the Court from granting relief to avoid a clear injustice. *See Guishan, Inc. v. Arici*, 635 F. Supp.2d 187, 192 (E.D.N.Y. 2009) (modifying judgment to include additional fees previously omitted by counsel, reasoning such an inadvertent mistake was "not a case where counsel made a conscious, strategic

16

**REDACTED**

decision"); *cf. Floyd v. City of New York*, 813 F. Supp. 2d 457, 469-70 (S.D.N.Y. 2011) (reconsidering judgment where party failed to properly analyze relevant data, finding the failure to be a "serious oversight" but "obviously not a tactical decision for which they must now pay the price"). That is particularly true because Ricoh's in-house team was not in a position to discover the expert's cross-comparison error. It was precluded from receiving copies of Kodak or OEM royalty reports and only had access to a heavily redacted expert report from Kodak's damages expert, which meant it had no access to one of the two sources being compared or to the expert's cross-comparison itself.

Third, and importantly, there is no prejudice to Kodak. Ricoh discovered the calculation errors shortly after entry of the Judgment and timely brought them to Kodak's attention. (Ex. 15 [January 31, 2014 Email from Eiseman to Summersgill].) Ricoh filed this motion only after efforts to address the mistake between the parties proved futile. There can be no doubt the existing judgment mistakenly provides Kodak with a double recovery of $7.7 million. When the proper quarters are compared, Kodak's own calculation methodology shows there are no unpaid royalties during the period of its patent license agreement with Sanyo. Ricoh also obtained confirmatory evidence of the royalty payments directly from Sanyo. Kodak cannot claim to have suffered undue prejudice in the few months since the entry of Judgment. *See, e.g.*, *Foley v. United States*, 645 F.2d 155, 157 (2d Cir. 1981) (reversing denial of relief from judgment, reasoning "it is difficult to imagine what possible undue prejudice might arise from a six-month delay"); *Advanced Cardiovascular Imaging¸* 2009 WL 3154317, at *3 (granting relief where delay of three months was not unduly prejudicial, reasoning that "[s]hort delays generally do not prejudice the nonmoving party"). That is particularly true given that the Judgment itself

**REDACTED**

incorporates the parties' agreement that a change in the status of OEM royalty payments may necessitate a modification of the judgment.  (*See* Judgment, Ex. A at ¶ 12.)

Therefore, all the factors strongly support finding that any negligence contributing to the mistaken calculation was excusable under the circumstances.

## The Court Should Grant Relief as a Matter of Equity

Even where Rule 60(b)(1) does not provide an appropriate basis for relief, Rule 60(b)(6) empowers the court "to do justice in a particular case when relief is not warranted by the preceding clauses . . . which, in a proper case, is to be liberally applied."  *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1997) (quotations omitted).  Such proper case includes extraordinary circumstances or where a judgment would work an extreme hardship.  *Emergency Beacon Corp*, 666 F.2d at 759.  And "double recovery constitutes extraordinary circumstances which justify relief from judgment."  *F.D.I.C. v. United Pacific Ins. Co.*, 152 F.3d 1266, 1275 (10th Cir. 1998); *cf. Johnson Waste Materials v. Marshall,* 611 F.2d 593, 599 (5th Cir. 1980) (noting that when there is "practically conclusive evidence" that judgment has been satisfied, judgment should be set aside to prevent a "windfall" and "manifest miscarriage of justice" (internal quotations and emphasis omitted)).

As a result of a mutual misunderstanding, Kodak now stands to obtain $7.7 million in royalties it has already received from Sanyo.  Allowing double recovery of millions in royalties on the same cameras would result in an unprecedented windfall to Kodak.  The equitable considerations strongly favor granting relief under these extraordinary circumstances.  *See In re UAL Corp.*, 411 F.3d at 824-25 (noting that "loss of a windfall is not the kind of harm that a court should endeavor to avert" and that a court should rectify "an innocent mistake" where doing so does not harm anyone).

REDACTED

### In the Alternative, the Court Should Schedule a Hearing on Sanyo's Payments to Kodak

As demonstrated above, a correct understanding of the relevant data yields no conclusion other than that Kodak has already received any royalties due on Sanyo digital cameras sold to Pentax.  And Rule 60(b) and the Judgment and Stipulation clearly empower this Court to alter the Judgment to correct the damages figure.  To the extent Kodak continues to contend that it has not received full payment on the sales during its patent license agreement with Sanyo, Ricoh requests that the Court vacate paragraph 5(b) of the Judgment and schedule a hearing—after resolution of Ricoh's upcoming appeal—to determine the amount of royalties already paid to Kodak. *See United States v. City of Fort Smith*, 760 F.2d 231, 233-34 (8th Cir. 1985) (vacating denial of relief from consent decree and remanding for an evidentiary hearing on issue of mutual mistake).

**CONCLUSION**

For the reasons stated above, Ricoh respectfully requests that paragraph 5(b) of the Judgment be corrected to replace "$17.7 million" with "$10.0" million.  In addition, paragraph 5(e) of the Judgment should be modified to replace "$4.83 million" with "$4.06 million" to account for interest on the improperly included damages.


DATED:  February 27, 2014

**REDACTED**

By: /s/ *David Eiseman*
_____

David Eiseman*
Melissa J. Baily
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
davideiseman@quinnemanuel.com
melissabaily@quinnemanuel.com

Christopher Tayback*
Ryan S. Goldstein*
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000
ryangoldstein@quinnemanuel.com

*Admitted pro hac vice*

Richard de Bodo**
Bingham McCutchen LLP
1601 Cloverfield Boulevard
Suite 2050 North
Santa Monica, CA 90404
(310) 907-1000
rich.debodo@bingham.com

David B. Salmons**
Bingham McCutchen LLP
2020 K Street NW
Washington, DC 20006
(202) 373-6000
david.salmons@bingham.com

**Pro hac vice admission pending*

*Counsel for Defendant Ricoh Company, Ltd.*